**13-2915-cv**
*Matthews v. City of New York*

In the

United States Court of Appeals

For the Second Circuit

————

AUGUST TERM, 2013

ARGUED: APRIL 24, 2014
DECIDED: FEBRUARY 26, 2015

No. 13-2915-cv

CRAIG MATTHEWS,
*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK; RAYMOND KELLY, as Commissioner of the New
York City Police Department; JON BLOCH, a deputy inspector in the
New York City Police Department; and MARK SEDRAN, a lieutenant
in the New York City Police Department,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 12-cv-1354 – Paul A. Engelmayer, *Judge*.

————

Before: WALKER and HALL, *Circuit Judges*, and MURTHA, *District
Judge*.[*]

————

---

[*] The Honorable J. Garvan Murtha, of the United States District Court
for the District of Vermont, sitting by designation.

Officer Craig Matthews brought suit alleging that the City of New York retaliated against him for speaking to his commanding officers about an arrest quota policy at his precinct of the New York City Police Department ("NYPD"). The United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*) granted the defendants' motion for summary judgment, holding that Matthews spoke as a public employee, not as a citizen, and that his speech was thus not protected by the First Amendment. We conclude that because Matthews's comments on precinct policy did not fall within his official duties and because he elected a channel with a civilian analogue to pursue his complaint, he spoke as a citizen. Accordingly, we VACATE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.

————

CHRISTOPHER DUNN, (Erin Harrist, Arthur Eisenberg, Alexis Karterton, *on the brief*), New York Civil Liberties Union Foundation, New York, N.Y., *for Appellant*.

MARTA ROSS, (Edward F.X. Hart, William S.J. Fraenkel, *on the brief*) *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, N.Y., *for Defendants-Appellees.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Officer Craig Matthews brought suit alleging that the City of New York retaliated against him for speaking to his commanding officers about an arrest quota policy at his precinct of the New York City Police Department ("NYPD"). The United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*) granted the defendants' motion for summary judgment, holding that Matthews spoke as a public employee, not as a citizen, and that his speech was thus not protected by the First Amendment. We conclude that because Matthews's comments on precinct policy did not fall within his official duties and because he elected a channel with a civilian analogue to pursue his complaint, he spoke as a citizen. Accordingly, we VACATE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

### I.    Matthews's Speech about the Quota System

Since 1999, Craig Matthews, an NYPD police officer, has been assigned to the 42nd Precinct ("the Precinct") in the Bronx. He alleges that starting in 2008, unnamed supervisors in the Precinct implemented a quota system mandating the number of arrests,

3

summons, and stop-and-frisks that police officers must conduct. Matthews also alleges that Lieutenant Mark Sedran "refined the quota system" by creating a point system that awarded points to police officers for issuing what Sedran considered "'good' summonses" and subtracted points for less desirable summonses. Compl. ¶ 18, Joint App'x 25. Matthews alleges that officers were under pressure to comply with the quota system.

In February 2009, Matthews, believing that the quota system was damaging to the NYPD's core mission, reported its existence to then-Captain Timothy Bugge, the Precinct's commanding officer at that time. In March and April of 2009, Matthews again reported the quota system's existence to Captain Bugge, and, in May 2009, Matthews reported the same to an unnamed Precinct executive officer.

In January 2011, Matthews met with then-Captain Jon Bloch, the Precinct's new commanding officer, and two other officers in Captain Bloch's office. Matthews told them about the quota system and stated that it was "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers," and that it "was having an adverse effect on the precinct's relationship with the community." Compl. ¶ 28, Joint App'x 28.

4

## II. Matthews's Complaint and the Defendants' Motion to Dismiss

On February 28, 2012, Matthews filed a complaint under 42 U.S.C. § 1983 alleging that the NYPD retaliated against him in violation of the First Amendment to the U.S. Constitution and Article I, § 8 of the New York State Constitution because he spoke to the Precinct's leadership about the arrest quota policy. Although not relevant to this appeal, which is limited to the narrow question of whether Matthews spoke as a citizen or as a public employee, the alleged acts of retaliation consist of punitive assignments, denial of overtime and leave, separation from his career-long partner, humiliating treatment by supervisors, and negative performance evaluations.

On March 16, 2012, the defendants moved to dismiss, arguing that Matthews's speech was made pursuant to his official employment duties and was thus unprotected. The district court (Barbara S. Jones, *Judge*) granted the defendants' motion to dismiss. *See Matthews v. City of New York*, No. 12 Civ. 1354, 2012 WL 8084831 (S.D.N.Y. Apr. 12, 2012). On November 28, 2012, a panel of this court vacated the dismissal and remanded, holding that "[t]he record in this case is not yet sufficiently developed . . . to determine as a matter of law whether Officer Matthews spoke pursuant to his

official duties when he voiced the complaints." *Matthews v. City of New York*, 488 Fed. App'x 532, 533 (2d Cir. 2012). The panel stated that discovery was necessary as to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id*. (internal quotation marks omitted).

On remand, after the case was reassigned to District Judge Paul A. Engelmayer, the following evidence relevant to this appeal was developed in discovery.

### III. Matthews's Employment Duties

Matthews stated in an affidavit that the vast majority of his time as a police officer is spent:

> (1) going on radio runs, which are responses to 911 calls in the precinct, in addition to '311' requests, and requests that come through the station house telephone switchboard, (2) patrolling the streets and vertical patrolling of local housing, (3) filling out complaint reports and additional forms relating to criminal activity, lost property, and missing persons, including interviewing witnesses, (4) responding to traffic accidents, (5) transporting prisoners to and from the precinct house, courts, and hospitals, and (6) doing community visits with local businesses and organizations.

Joint App'x 91-92. Matthews's duties are formally defined by the NYPD Patrol Guide, which was created to serve as a "guide for ALL members of the service," although it does not "contain distinct

6

instructions for every situation that may be encountered in the field." Foreword, Patrol Guide, Joint App'x 410. Section 207-21 of the Patrol Guide, titled "Allegations of Corruption and Other Misconduct Against Members of the Service," states that:

> All members of the service must be incorruptible. An honest member of the service will not tolerate members of the service who engage in corruption or other misconduct. All members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.

Joint App'x 36. The Patrol Guide defines corruption and other misconduct as, "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by a member of the service whether on or off duty." *Id*. It also outlines a procedure for officers to report misconduct to the Internal Affairs Bureau and provides that the "[f]ailure to report corruption, other misconduct, or allegations of such act is, in itself, an offense of serious misconduct and will be charged as such." *Id.* at 37.

Commissioner John Beirne, Deputy Commissioner for Labor Relations for the NYPD, testified at deposition that a quota system alone is not misconduct but that a quota system that results in an

unjustified stop, an unjustified arrest, an unjustified summons, or an adverse employment action is misconduct that must be reported. Matthews testified that the Patrol Guide does not obligate him to report the existence of a quota system and that he would only have a duty to report misconduct that violated the penal law. It is undisputed that Matthews did not regularly meet with or report to Captains Bugge or Bloch. Commissioner Beirne, Captain Bloch, and Captain Bugge testified that an officer has no duty to monitor the conduct of his or her supervisors.

## IV.    Avenues for Civilian Complaints to the NYPD

Patrol Guide Section 202-09 states that one duty of a commanding officer in the NYPD is to "[m]aintain as much personal contact as possible with business, civic [organizations] . . . and other groups or media with community influence and interests to keep abreast of community tensions and trends." Joint App'x 209. In this spirit, the Precinct held monthly Community Council meetings in which the public was invited to raise concerns about policing practices. Captain Bloch testified that he routinely attended these meetings, missing fewer than four or five of the previous thirty.

In addition to the Community Council meetings, Captain Bugge testified that, one to three times per month, he met with members of the public, such as local politicians, church leaders, or

8

members of civic associations, to discuss policing issues in the Precinct. The minutes of one Community Council meeting reflect that Captain Bugge announced that "he welcomes the community to call him and discuss problems." Joint App'x 246. Captain Bloch testified that in his experience, however, meetings with community members outside of the Community Council meetings happened "rarely." Joint App'x 131.

## V. The Defendants' Motion for Summary Judgment

On May 20, 2013, the defendants moved for summary judgment. On July 29, 2013, the district court granted the defendants' motion. The district court held that Matthews's speech was made as an employee of the NYPD, not as a citizen, and thus was not protected by the First Amendment.

Matthews now appeals.

## DISCUSSION

## I. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Natural Res. Def. Council, Inc. v. U.S. Food and Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013). Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991) (quoting *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991))**.**

## II. Legal Framework

A plaintiff asserting a First Amendment retaliation claim must establish that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). The district court granted summary judgment to the defendants on the basis that Matthews's speech was not protected. We address only that issue.

A court conducts a two-step inquiry to determine whether a public employee's speech is protected: "The first requires determining whether the employee spoke as a citizen on a matter of

public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)). This step one inquiry in turn encompasses two separate subquestions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420-22). If the answer to either question is no, that is the end of the matter. If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis: whether the relevant government entity "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane v. Franks*, 134 S.Ct. 2369, 2380 (quoting *Garcetti*, 547 U.S. at 418); *see also Pickering*, 391 U.S. at 568.

The district court determined that Matthews spoke on a matter of public concern and the defendants-appellees do not

challenge that determination here. This appeal concerns only whether Matthews spoke as a citizen or as a public employee. The district court held that Matthews spoke as a public employee. We disagree with that conclusion, however, and hold that Matthews spoke as a citizen. Accordingly, we remand to the district court to determine whether an adequate justification existed for treating Matthews differently from any other member of the public, and if necessary, to analyze in the first instance whether a reasonable jury could find that Matthews suffered retaliation as the result of exercising his First Amendment rights.

## III. The Citizen/Employee Distinction

The Supreme Court has recognized a tension in public employment free speech cases between an employee's First Amendment rights and the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters

12

of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Guided by the Supreme Court's decision in *Garcetti*, we ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's "official responsibilities," and (B) does a civilian analogue exist? *See Weintraub v. Bd. of Educ. of City Sch. Distr. of City of. N.Y.*, 593 F.3d 196, 203-04 (2d Cir. 2010).

**A. Official Duties**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. Accordingly, we have held that speech is not protected if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (internal quotation marks omitted).

In *Garcetti*, the Supreme Court adopted a functional approach toward evaluating an employee's job duties. There, a deputy district attorney alleged that he had been retaliated against for writing a memorandum recommending that a case be dismissed. The Supreme Court held that the prosecutor's memorandum to his superior was unprotected because it was "part of what [the speaker] . . . was employed to do." *Garcetti*, 547 U.S. at 421. The "controlling factor" in its decision, the Court noted, was that the employee's "expressions were made pursuant to his duties as a calendar deputy." *Id*. The Court counseled that the appropriate inquiry is a "practical one" directed to the regular duties of the employee. *Id.* at 424. While relevant to that inquiry, the Court cautioned, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform" and "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

We have applied *Garcetti*'s functional approach in previous cases. In *Weintraub*, we held that a school teacher's formal grievance regarding the administration's refusal to discipline a student was unprotected speech because a teacher's need to discipline his own students is essential to his ability to effectively run a classroom as part of his day-to-day responsibilities. 593 F.3d at 203. We also found that the teacher's choice to pursue his complaint by following the employee grievance procedure supported the conclusion that the speech was unprotected because that procedure had no civilian analogue. *Id.*

Similarly, in *Ross v. Breslin*, we held that a payroll clerk's speech to her superiors about pay discrepancies was unprotected because it was part of her job responsibilities, which included "making sure pay rates were correct." 693 F.3d 300, 306 (2d Cir. 2012). We noted that the determination of "whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule," and that "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech,

15

and the relationship between the two." *Id.* Because the employee was expected to uncover wrongdoing as part of her daily job as a payroll clerk, we concluded that her speech was not protected.

In this case, Matthews reported the existence of the quota system on three occasions to Captain Bugge and on one occasion to an unnamed executive officer in the Precinct. Over a year later, after Captain Bloch had replaced Captain Bugge as the Precinct commanding officer, Matthews reported the quota system to him and stated that it was "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers" and it "was having an adverse effect on the precinct's relationship with the community." Joint App'x 28.

Matthews's speech to the Precinct's leadership in this case was not what he was "employed to do," unlike the prosecutor's speech in *Garcetti*, nor was it "part-and-parcel" of his regular job, unlike the case of the teacher in *Weintraub* and the payroll clerk in *Ross*. Matthews's speech addressed a precinct-wide policy. Such policy-

16

oriented speech was neither part of his job description nor part of the practical reality of his everyday work. Section 202–21 of the NYPD Patrol Guide, which outlines the "Duties and Responsibilities" of a Police Officer, reinforces this conclusion. It lists 20 specific duties, but none includes a duty to provide feedback on precinct policy or any other policy-related duty. *See* Joint App'x 113. Matthews similarly stated that his job as a police officer consisted of radio runs, patrols, complaint reports, and other tasks involving enforcement of the law; it did not include reporting misconduct of supervisors nor did it encompass commenting on precinct-wide policy. Matthews had no role in setting policy; he was neither expected to speak on policy nor consulted on formulating policy. Commissioner Beirne, Captain Bloch, and Captain Bugge all testified that a police officer has no duty to monitor the conduct of his supervisors. Captain Bloch and Captain Bugge also testified that Matthews neither met regularly with the Captains nor submitted regular reports to them. Apart from the occasions on which Matthews spoke to them about the quota system, he did not

17

communicate with the Precinct's commanding officers beyond occasional hallway small talk. In sum, Matthews's actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders.

We hold that when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee.

The City points to Section 207-21 of the NYPD Patrol Guide, which, as noted earlier, states in pertinent part "[a]ll members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware." Joint App'x 36. It defines "corruption/other misconduct" as "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by a member of the service whether on or

18

off duty." *Id.* The district court relied on this provision in holding that Matthews's reports were part of his official duties. We believe this reliance was misplaced.

Matthews testified that he understood Section 207-21 to require only reports of misconduct rising to the level of a violation of penal law. Commissioner Beirne testified that the section requires reports of almost every violation of the Patrol Guide.. Under either interpretation, however, the provision does not render Matthews's speech unprotected.

Matthews, in speaking out about the quota system, was not reporting suspected violations of law that might have required him to exercise his authority to arrest a fellow police officer or turn in an officer for breach of a protocol. Matthews admitted that he would have to report a police officer who violated the law, but this is not such a case. Here, Matthews was voicing concerns about broad policy issues that, at most, had the potential of incentivizing a violation of law; he was not identifying individual violations. Matthews told Captain Bloch that, as a result of the quota policy,

19

"police officers felt forced to abandon their discretion," which was causing "unjustified stops." Compl. ¶ 28, Joint App'x 28. Matthews was not flagging specific violations of law, but rather expressing an opinion on a policy which he believed was limiting officer discretion to not intervene in situations that, in the officer's own judgment, might not warrant intervention. According to Matthews, the policy resulted in stops that were "unjustified" because no officer properly exercising discretion would have made them. In addition, we note that Matthews, by reporting the quota system to the Precinct commanders instead of to the NYPD Internal Affairs Bureau, did not follow the internal procedures set out in Section 207-21.

Even if Matthews's speech were deemed to fall within Section 207-21, this provision would not be determinative of whether that speech was protected by the First Amendment. If the Patrol Guide's general duty to report misconduct were permitted to control whether the speech of any employee—without regard to whether the investigation and reporting of misconduct is an integral part of the employee's day-to-day job (i.e. what he or she is "employed to

20

do," *Garcetti*, 547 U.S. at 421)—enjoyed First Amendment protection, public employers could be encouraged to simply prescribe similarly general duties, thereby limiting such protection for wide swaths of employee speech. When Justice Souter's dissent in *Garcetti* flagged this risk, *id.* at 431 n.2, the Court majority responded by explicitly "reject[ing] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions," *id.* at 424. To be sure, the duty to report misconduct has increased relevance in the context of law enforcement, but we believe that it is more properly considered as part of the *Pickering* balancing analysis in determining whether the government employer had an adequate justification for its actions. *See supra* DISCUSSION, Section II, Legal Framework; *see also Lane*, 134 S.Ct. at 2381 (describing the *Pickering* framework as "balancing the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (citing *Pickering*, 391 U.S. at 598 (internal quotation marks and brackets omitted))).

**B. Civilian Analogue**

The existence of a comparable civilian analogue for Matthews's speech also supports our conclusion that he spoke as a citizen. Speech has a "relevant civilian analogue" if it is made through "channels available to citizens generally." *Jackler*, 658 F.3d at 238. "[A]n indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an 'independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Id.* at 241 (quoting *Weintraub*, 593 F.3d at 204).

In *Jackler*, we held that a police officer's refusal to retract a truthful report to the police had a civilian analogue because a non-employee citizen may also refuse to retract a truthful police report. 658 F.3d at 241. In *Weintraub*, on the other hand, we found the teacher's speech unprotected in part because "lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." 593 F.3d at 204.

Unlike the teacher in *Weintraub*, Matthews did not follow internal grievance procedures, but rather went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints.

Matthews chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the Precinct commanders. Captain Bloch stated that he attended nearly every monthly Community Council meeting. And Captain Bugge testified that one to three times per month he met with members of the community to discuss issues in the Precinct. Matthews reported his concerns about the arrest quota system to the same officers who regularly heard civilian complaints about Precinct policing issues.

The district court found an absence of a civilian analogue because Matthews had better access to his commanding officers than would ordinary citizens. The district court noted that Matthews could speak to the officers "more readily, more frequently, and more privately than could an average citizen." *Matthews v. City of New York*, 957 F. Supp. 2d. 442, 465 (S.D.N.Y. 2013). We do not consider

the relative degree of access to be material; rather what matters is whether the same or a similar channel exists for the ordinary citizen. If courts were to confine their focus to the degree of access, then internal public employee speech on matters of public concern not made as part of regular job duties would be unlikely to receive First Amendment protection because, presumably, employees always have better access to senior supervisors within their place of employment.

Here, Matthews pursued the same avenue to complain about a precinct-wide policy as would a concerned civilian. The channel Matthews chose to address his concerns about the quota system thus reinforces our conclusion that Matthews spoke as a citizen, not as a public employee.

## CONCLUSION

For the reasons stated above, we **VACATE** the district court's grant of defendants' motions for summary judgment and **REMAND** for further proceedings consistent with this opinion.