20-4211-cv
*Specht v. City of New York, et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2020

No. 20-4211-cv

SCOTT P. SPECHT,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, THOMAS KANE, AND JOHN DAVID LYNN,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of New York.
No. 1:19-CV-6438 (ENV) (SJB)
Eric N. Vitaliano, District Judge, Presiding.
(Argued June 22, 2021; Decided October 6, 2021)

Before:     NEWMAN, CABRANES, and PARKER, *Circuit Judges.*

Appellant Scott P. Specht, employed as a New York City fire marshal, alleges that after he refused to file a false report concerning the circumstances of a fire he was investigating and publicly discussed misconduct on the part of his

supervisors, he was the subject of retaliation. Specht sued alleging, among other claims, a First Amendment retaliation claim. *See* 42 U.S.C. § 1983. Defendants-Appellees moved to dismiss all claims under Rule 12(b)(6). The United States District Court for the Eastern District of New York (Vitaliano, *J.*) granted the motion and Specht appeals. We conclude that Specht alleged a First Amendment retaliation claim but failed to state a New York State Civil Service Law § 75-b claim or intentional infliction of emotional distress claim. Accordingly, we **REVERSE** in part and **AFFIRM** in part the district court's dismissal of the First Amendment retaliation claim, we **AFFIRM** the dismissal of Specht's New York Civil Service Law § 75-b claim and his intentional infliction of emotional distress claim, and **REMAND** for further proceedings.

—————————————————

NATHANIEL B. SMITH, Law Office of Nathaniel B. Smith, New York, New York, *for Plaintiff-Appellant.*

JAMES E. JOHNSON, (Jonathan A. Popolow, *on the brief*), Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellees.*

—————————————————

BARRINGTON D. PARKER, *Circuit Judge*:

## BACKGROUND

Scott P. Specht appeals from a judgment of the United States District Court for the Eastern District of New York (Vitaliano, *J.*) dismissing pursuant to Rule 12(b)(6) his First Amendment retaliation and state law claims. *See* 42 U.S.C. § 1983. We hold that the district court erred in dismissing Specht's First

2

Amendment retaliation claim in its entirety. We affirm the district court's dismissals of Specht's New York Civil Service Law § 75-b claim and his intentional infliction of emotional distress claim. Accordingly, we remand for further proceedings.

Specht joined the Fire Department of New York ("FDNY") in 2003 and was promoted to fire marshal in 2014, where his primary responsibilities involved investigating the origins of fires. This lawsuit arose from Specht's work investigating a fire in March 2018 that destroyed a five-story brownstone in Manhattan where a motion picture was being filmed. The fire resulted in serious damage to the building and the death of a firefighter.

Over the course of his investigation, Specht alleges, he studied physical evidence from the fire and interviewed witnesses. He tentatively concluded that the cause of the fire was either a boiler that had been the subject of unauthorized repairs, or the activities of the movie production crew. Ultimately, he informed his supervisors, Chief Fire Marshal Thomas Kane and Assistant Chief Fire Marshal John David Lynn, that his tentative conclusion was that the fire was the result of work done by the movie crew. He concluded that the movie crew had improperly installed high-intensity

lighting and had drilled holes in the wall, floors, and ceilings of the basement of the brownstone and that this work had caused the fire.

Specht alleges that about three weeks into his investigation, Kane and Lynn convened a meeting at FDNY headquarters where they demanded that he prematurely terminate his work and ordered him to file a final report concluding that a flue connected to the boiler caused the fire. Specht told them, he alleges, that there was no basis for that conclusion and that his investigation had not been completed. Following this meeting, Specht told his immediate supervisor that he could not and would not file such a report as directed by Kane and Lynn. The supervisor allegedly told him that if he did not comply, he would be committing "career suicide." Specht speculated that his superiors in the Department pushed the boiler theory because they did not want to embarrass the film production crew because film production was a highly lucrative source of revenue for the City.

About two weeks later, another meeting was convened at FDNY headquarters where, Specht alleges, he was verbally attacked by Kane, Lynn and other FDNY officers present for failing to file the report as directed and was again instructed to do so. He also alleges that, contrary to accepted

4

investigative practices, Kane and Lynn refused to permit experts from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to inspect the boiler, although they were separately investigating the fire. He alleges that his superiors also refused to permit ATF agents to participate in discussions about the investigation and that they released the boiler to agents of the movie company. In addition, Specht alleges that Lynn ordered the removal of the sprinkler system valves from the fire site and concealed them in an FDNY facility and directed that no photographs or other records be made to document their removal. Finally, Specht alleges that when he refused the second order to file a report blaming the boiler, Kane and Lynn removed him from the investigation and Specht's replacement then, at their direction, prepared a report, finding that the boiler system had caused the fire.

Specht alleges that his supervisors' direction to file a false report was an attempt to cover up the origins of the fire and constituted official misconduct. He further alleges that after his removal from the investigation, he publicly voiced his views both inside and outside the Department that the report contained false conclusions about the origins of the fire. On May 1, 2018, he emailed his fellow Fire Marshals alluding to what had happened to him, stating in part:

5

My advice to the members of the Bureau of Fire Investigation is to stay true to your methodology, your training, and yourself. Do not succumb to the great pressures that will be placed upon you by the supervisory members of this bureau. At the end of the day, it will be YOU answering to your methods under oath. More importantly, it will be YOU answering to the reflection you see in the mirror.

Specht alleges that following this email, he continued to complain about the incident, this time outside the Department. In June 2018, he met with representatives of the New York City Department of Investigation ("DOI") and reported his complaints about Kane's and Lynn's actions. The next month, he filed a Notice of Claim with the New York City Comptroller's Office stating his intention to sue Lynn, Kane, and the City of New York for retaliation. The Notice of Claim asserted, among other things, that Kane and Lynn improperly terminated Specht's investigation of the fire; that Kane and Lynn's conduct improperly permitted a movie company to circumvent a full investigation of the fire; and that Kane and Lynn had improperly removed him from the investigation as part of their efforts to conceal the movie company's role in the fire. The next day, July 18, *New York Daily News* picked up the story and published an article reporting the Notice of Claim. The article's headline stated that "[l]egal papers suggest FDNY coverup in probe of fatal Harlem fire on Edward Norton set" and reported Specht's allegations that his FDNY supervisors

6

retaliated against him for suggesting that the movie company bore responsibility for the fire. Specht also alleges that a short while later, he met with the New York County District Attorney's Office to report the alleged misconduct.

In September 2018, Lynn and Kane placed Specht on modified duty status. This reassignment, Specht contends, was without justification, substantially reduced his job responsibilities, and denied him overtime opportunities. He contends that this demotion pushed him to apply for disability retirement benefits. The application was delayed but eventually approved. But the delay and the loss of overtime reduced his retirement benefits.

Specht then sued Kane, Lynn, and the City of New York in state court. His complaint asserted a 42 U.S.C. § 1983 First Amendment retaliation claim, a New York State Civil Service Law § 75-b (state whistleblower law) retaliation claim, and a common law claim of intentional infliction of emotional distress. The Defendants removed the action to federal court and moved to dismiss under Rule 12(b)(6).

The district court granted the motion. It held that Specht's First Amendment retaliation claim involved speech that was not constitutionally protected because it concerned only internal workplace issues rather than

7

matters of public concern and because Specht had spoken in his capacity as an employee, not as a private citizen. These distinctions, the district court reasoned, were fatal to a public employee's retaliation claim under *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

The district court also held that Specht failed to plead a valid New York State Civil Service Law § 75-b claim because he had not exhausted the grievance procedures in an applicable collective bargaining agreement ("CBA"). Next, the court dismissed Specht's claim for intentional infliction of emotional distress, reasoning that he had not alleged that Defendants had engaged in sufficiently "extreme and outrageous conduct" to state a claim under New York law.

Finally, the district court denied Specht leave to amend the complaint, concluding that he would not be able give his claims "the significant shot in the arm" required to resuscitate them. This appeal followed.

**STANDARD OF REVIEW**

We review the grant of a Rule 12(b)(6) motion to dismiss *de novo. See Montero v. City of Yonkers, New York*, 890 F.3d 386, 394 (2d Cir. 2018). We accept the factual allegations as true and "draw[] all reasonable inferences in favor of the plaintiff." *Id*. But those allegations must meet the plausibility standard set out

in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

**DISCUSSION**

I.

To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity. *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities. *Garcetti*, 547 U.S. at 420-21.

A.

Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement. *Montero*, 890 F.3d at 399. Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to

9

the community or value and concern to the public. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011). To identify matters of public concern, "we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]" *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014) (internal quotation marks and alterations omitted).

A number of our prior cases have considered whether a public employee's speech touches on a matter of public concern. In *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), for example, the plaintiff, a police officer, alleged that he had been fired for refusing to retract a report that he had made in support of a civilian complaint accusing another officer of using excessive force. *Id.* at 230-32. The district court dismissed the suit, holding that the plaintiff's refusal was made while he was acting in his role as a police officer. We reversed, concluding that because the filing of a false report would have implicated the officer in criminal misconduct, his refusal to do so could not have been a job requirement. Rather, we reasoned, his refusal was pursuant to the obligation of every citizen to follow

10

the law. We also concluded that it was "clear" that Jackler's refusals to change his statement involved a matter of public concern. *Id.* at 240.

Similarly, in *Montero*, 890 F.3d at 390, a police officer sued the City of Yonkers Police Department alleging a First Amendment retaliation claim. The officer alleged that he was retaliated against for: (1) criticizing then-Yonkers PBA President Olson's relationship with then-Police Commissioner Hartnett; (2) criticizing Hartnett's decisions to discontinue several police units that investigate domestic violence and burglary; and (3) calling for a no-confidence vote on Hartnett. The district court dismissed the officer's claims, holding that his remarks were made pursuant to his official responsibilities and thus not protected by the First Amendment. With respect to Montero's criticism of Olson's relationship with Hartnett, we affirmed, reasoning that Montero's speech "plainly" was not of public concern because it "reflected a personal rivalry[.]" *Id.* at 400. With respect to both the officer's criticisms about the decision to discontinue certain police units and the officer's call for a no-confidence vote, however, we reversed. We held that the officer spoke as a citizen on a matter of public concern because, among other reasons, he had alleged that the termination of police units would endanger public safety. *Id.* at 386.

11

With these precedents in mind, we consider Specht's email to his colleagues, then his statements to outside agencies, and finally his refusal to file an allegedly false investigative report. First, Specht alleges that he sent the email "to document the status and results of his investigation into the fire." In the email, Specht advised his colleagues not to (among other things) "succumb to the great pressures that will be placed upon you by the supervisory members of this bureau."

We agree with the district court that the point of this email was to share with other fire marshals Specht's take on the course of the investigation and his reaction to what he considered inappropriate pressure from his supervisors. These are internal workplace grievances, not matters of public concern. Neither the substance nor the intended audience of Specht's email—his colleagues— suggests that Specht sought to inform the public on a matter of political, social, or community interest. If the email were ever released to the public, it would convey no information other than the fact that a single employee was upset by an incident that occurred in the workplace. We have been clear that statements that fall into this category do not garner First Amendment protection. *See Singer v. Ferro*, 711 F.3d 334, 340 (2d Cir. 2013); *Singh v. City of New York*, 524 F.3d 361, 372

12

(2d Cir. 2008). The district court was therefore correct in concluding that Specht's email to his colleagues was not protected speech.

Next, as noted, Specht alleges that in addition to the email, he expressed his views on the handling of the investigation of the fire outside the Department. He reported his complaints about the reaction to his investigation to the New York City Department of Investigation, he filed a Notice of Claim with the City describing what had transpired, he met with representatives of the District Attorney's office, and he communicated with the local press, which reported on the events.

We conclude that these reports touch on matters of public concern. To begin with, possible governmental misconduct is a legitimate and an important topic of public concern. *Lane v. Franks*, 573 U.S. 228, 241 (2014) (concluding that testimony concerning "corruption in a public program . . . obviously involves a matter of significant public concern"); *Singer*, 711 F.3d at 340 (recognizing that "governmental corruption is plainly a potential topic of public concern"); *Jackler*, 658 F.3d at 236 (reasoning that the "[e]xposure of official misconduct . . . is generally of great consequence to the public"); *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999) (recognizing that "corruption or public wrongdoing" is almost

13

always a matter of public concern). And although we have heard cases involving widespread misconduct, *see Cotarelo v. Village of Sleepy Hollow Police Dept*, 460 F.3d 247, 252 (2d Cir. 2006), the alleged misconduct need not be systemic or pervasive to touch on a matter of public concern. Indeed, *Jackler* and *Montero* indicate that even isolated instances of official conduct may implicate matters of public concern. *See also Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 46 (2d Cir. 2018) ("A single incident of official misconduct *may* touch on a matter of public concern[.]"). Here, Specht has alleged that members of the FDNY worked to mask the cause of a serious fire—one that the FDNY itself was charged by law with investigating. He has alleged further that these actions have allowed a movie production company to evade liability for practices that contributed to the fire and are "common . . . in the industry[.]" Specht's reports of these actions to outside agencies therefore implicate matters of public importance, as they relate to possible governmental malfeasance, public safety, as well as to the public fisc. *See Lane*, 573 U.S. at 241; *Montero*, 890 F.3d at 400; *Jackler*, 658 F.3d at 236-37.

We turn next to Specht's refusals to file a report that he alleges would have been false. It is well settled that the First Amendment protects the right of a citizen to choose both what he says and what he does not say. For that reason,

14

the refusal to engage in certain speech may constitute protected activity. *See Riley v. National Freedom of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) (reasoning that the First Amendment pertains to the right "of both what to say and what *not* to say"); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."). It is moreover well settled that a public employee—like any other citizen—has a "strong First Amendment interest" in refusing to engage in speech that would cause him to break the law by, for example, filing a false report. *Jackler*, 658 F.3d at 240-41. Here, Specht's refusals to file a false report—just like Specht's reports to outside agencies—pertain to the potentially serious governmental misconduct. Those actions cannot fairly be seen as ones exclusively intended to protect his reputation or enhance his career development. Considering the form, content, and context of Specht's refusal to file a false report, we conclude that this refusal constitutes activity that touches on a matter of public concern for purposes of the First Amendment.

The district court concluded that both Specht's reports to entities outside the FDNY and his refusal to file an allegedly false report pertained only to

15

internal workplace matters and not to ones of public concern. Although the district court acknowledged that Specht alleged that the defendants' behavior amounted to a "cover-up," it discounted that allegation, calling it "conclusory." For the reasons discussed, we do not agree. Drawing all reasonable inferences in Specht's favor, we believe the allegations are plausible, touch on matters of public importance, and extend beyond intramural workplace concerns.

B.

Specht's speech is not protected merely because it touches on a matter of public concern. To receive First Amendment protection, he must also have plausibly pled that he spoke as a citizen, rather than pursuant to his job requirements. *Garcetti*, 547 U.S. at 418.

In *Lane*, the Supreme Court considered what qualifies as "citizen speech." 573 U.S. at 238-41. There, the director of a state program asserted that he was demoted by the state because of his testimony to a federal grand jury about issues relating to his department's payroll. The lower court ruled that the plaintiff had not engaged in citizen speech because his testimony concerned information learned exclusively through his employment.

16

The Supreme Court reversed. It observed that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," *id.* at 239, and that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech," *id.* at 240.

Our Court, too, has considered what counts as citizen speech. In *Weintraub v. Bd. of Educ.*, a public-school teacher filed a union grievance criticizing his superiors' failure to discipline a student who had assaulted him. 593 F.3d 196, 198-99 (2d Cir. 2010). We held that this grievance was pursuant to his employment—and thus not citizen speech—because it was "part-and-parcel" of his ability to perform his "official duties" as a teacher. These included the duty to "maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203.

We also thought it significant that Weintraub's union grievance lacked a citizen analogue: a "relevant analogue to speech by citizens who are not government employees." *Id.* (internal quotation marks omitted) (quoting *Garcetti*, 547 U.S. at 424). Two examples of citizen analogues provided by the Court in

17

*Garcetti* were "a schoolteacher's letter to a local newspaper," which "bore

similarities to letters submitted by numerous citizens every day," and

discussions of politics with a co-worker. *Weintraub*, 593 F.3d at 203-04. In

*Weintraub*, however, the plaintiff had "made an internal communication

pursuant to an existing dispute-resolution policy established by his employer,"

which was "not a form or channel of discourse available to non-employee

citizens." *Id*. at 204.

In *Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015), we

considered whether a police officer had acted as a private citizen in criticizing an

arrest-quota policy to his commanders. There, we identified two relevant

inquiries: (1) whether "the speech fall[s] outside of the employee's official

responsibilities," and (2) whether "a civilian analogue exist[s]." *Id*. at 173. We

concluded that Matthews's complaints were not part of what he was "employed

to do," *id*. at 174 ("Matthews had no role in setting policy; he was neither

expected to speak on policy nor consulted on formulating policy.") and that

ordinary citizens were also "regularly provided the opportunity to raise issues

with the [p]recinct commanders," *id*. at 176 ("Matthews did not follow internal

grievance procedures, but rather went directly to the [p]recinct commanders . . .

18

who had an open door to community comments and complaints."). We held that Matthews had therefore spoken as a citizen.

Here, Appellees argue that each time Specht spoke about his investigation into the fire, he did so pursuant to his official duties as a public employee, not as a private citizen. They argue that, since Specht's professional duty was to investigate the cause and origin of fires, his critique of his supervisors' conclusion about the cause of the fire fell within the scope of his duties. Specifically, Appellees claim that "[a]ll the speech that Specht claims prompted retaliation—his discussion of the report he planned to write[,] his email to his colleagues about the status of his investigation[,] and his complaints to outside agencies[]—concerned his investigation of the brownstone fire, and thus owed its existence to his official duties."

We are not persuaded. While, as the district court noted, filing an investigative report is part of a fire marshal's job, this case involves the *refusal* to file a false report, which is different than simply filing a report. We have been clear that a refusal to file a false report may receive First Amendment protection. In *Jackler*, we concluded that the appellant's refusals to obey demands to file false

19

statements constituted speech activity that was significantly different from the mere filing of a report. 658 F.3d at 241.

In *Lane*, the Court observed that the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S. at 240. It is clear to us that the filing of a false report—or the refusal to file one—is most assuredly not within the scope of a public employee's duties because, among other reasons, the filing of a false investigative report is a crime in New York. S*ee* N.Y. Penal Law § 175.30. Thus, Specht's refusal to do so can hardly be considered "part-and-parcel" of his duties. *See Jackler*, 658 F.3d at 241-42 (holding that a police officer "was not simply doing his job in refusing to obey" orders to file an allegedly false report).

By the same token, Specht's reporting to the outside agencies what he observed and what he had been asked to do was not done in his capacity as an employee. Although we recognize that the Supreme Court has cautioned that "[f]ormal job descriptions often bear little resemblance to," an employee's true duties, *Garcetti*, 547 U.S. at 424-25, such descriptions are nonetheless "relevant" to our inquiry, *Matthews*, 779 F.3d at 173. And among the duties listed in the

20

FDNY Fire Marshal job description are examining, collecting, and preserving fire scene evidence; providing expert and lay witness testimony; and preparing fire investigation reports. Nothing in that description suggests that reporting misconduct to outside agencies would be a normal part of Specht's professional activities. In addition, because citizens are entitled to voice complaints to the same agencies to which Specht reported (the DOI, DA's office, and Comptroller's Office), his speech has a citizen analogue. *See Matthews*, 779 F.3d at 175 (reasoning that speech has a "relevant civilian analogue" if it is made through "channels available to citizens generally") (internal quotation marks omitted). The existence of this citizen analogue reinforces our conclusion that, with respect to Specht's refusal to file the report and his complaints to outside agencies, Specht spoke as a citizen, rather than merely as a public employee.

C.

We consider next whether Specht's allegations satisfy the second element of a First Amendment retaliation claim—that he suffered an adverse employment action. *Smith*, 776 F.3d at 118. For purposes of the First Amendment, an "adverse employment action" is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional

21

rights[.]" *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001). Our test for determining whether an employer has taken adverse action is not wooden: it must be "tailored to the different circumstances in which retaliation claims arise." *Id.* (internal quotation marks omitted). *See Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 273 (2d Cir. 2011) (applying the adverse action test and "[r]ecognizing that [the] test is highly context-specific[.]").

Specht alleges that, among other things, he was removed from his role in investigating the fire, "placed on modified duty," and forced to "turn in his gun, badge and identification card." In other words, he alleges (plausibly) that he was reassigned. We have little difficulty concluding that such a reassignment constitutes an adverse employment action that would deter a reasonable employee from exercising his constitutional rights. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 71 (2006); *Bernheim v. Litt*, 79 F.3d 318, 326 (2d Cir. 1996).

D.

Finally, Specht must plausibly allege a causal connection between the adverse employment decision and the protected First Amendment activity. *Smith*, 776 F.3d at 118. To permit an inference of causation, a plaintiff must show

that the protected activity "was a substantial motivating factor in the adverse employment action[.]" *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

We conclude that Specht has done so. A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time. *Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006). We have previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Here, Specht has alleged that he was placed on modified duty five months after his refusal to file the investigative report and two months after he spoke to the New York County District Attorney's Office. We hold that the time period between these events and Specht's protected conduct is sufficient to permit an inference of causation.[1]

## II.

We turn next to Specht's retaliation claim under New York State Civil Service Law ("CSL") § 75-b. As a predicate to suing under the CSL, an employee

---

[1] Because the district court dismissed Specht's First Amendment retaliation claim, it did not reach the question of whether Specht stated a *Monell* municipal liability claim against the City of New York. *See Monell v. Dpt. Of Social Services*, 436 U.S. 658 (1978). We leave this issue to be considered in the first instance by the district court on remand.

must exhaust his remedies under an applicable CBA when it contains (1) a clause preventing an employer from taking adverse personnel actions and (2) an arbitration provision. Here, the applicable CBA[2] provided a grievance procedure for any "complaint arising out of a claimed violation, misinterpretation or inequitable application of the provisions of this contract or of existing policy or regulations of the" FDNY. Under that procedure, an employee has the right to file an internal grievance and then two appeals. Following those appeals, the union may then take the grievance to arbitration. Below, the district court dismissed Specht's claims under the CSL because he failed to exhaust the administrative remedies applicable at every step of the process—from the initial grievance through arbitration.

On appeal, Specht does not dispute that the statute requires exhaustion under certain circumstances or that he failed to exhaust his remedies. Instead, he contends that he was not required to exhaust any remedies because the CBA does not govern the subject matter of his whistleblower claim. He also argues that the CBA did not contain a "final and binding" arbitration provision as

---

[2] Although the CBA had expired when Specht's claims arose, the district court ruled that the terms of the CBA remained binding under New York law until a new agreement applies. See Civil Service Law § 209-a(1)(e). Because Specht does not dispute this ruling on appeal, we hold that he has waived any argument to the contrary.

24

required under the CSL because the union has the sole right to initiate arbitrations.

We find these claims unpersuasive. First, Specht's contention that the CBA does not govern his dispute is belied by his own amended complaint, which states that his placement on modified duty was "in violation of established employment procedures at the FDNY." We agree with Appellees that this allegation fits comfortably within the category of disputes concerning "existing policy or regulations of the [FDNY]."

Second, Specht's argument that the CBA does not provide for "final and binding arbitration" is similarly unpersuasive. The CBA covers Specht's complaints about his treatment by the FDNY by broadly authorizing arbitration of grievances concerning claimed violations, misinterpretations, or inequitable applications of FDNY policies or regulations. However, Specht contends that the CBA should be understood to contain no "final and binding" arbitration clause because only the union and not he can initiate arbitration. That argument is meritless. Collective bargaining agreements, such as the one here, are between employers and unions. Unions are by law required to fairly represent their members by, among other ways, filing grievances and, if necessary, arbitrating

25

on their members' behalf. Specht points to no language in the CSL and no other authority from any source suggesting that an arbitration provision must allow for an employee, and not the union acting on his behalf, to initiate the arbitration proceedings. Rather, the CSL provides only that the arbitration provision be in place "to resolve alleged violations of" the CBA, which is precisely the function of the arbitration provision here. Because Specht pursued none of the grievance procedures in the CBA including its arbitration provisions, the district court correctly dismissed his CSL claims.

III.

Finally, we turn to Specht's claim that the Appellees' conduct constituted intentional infliction of emotional distress ("IIED") under New York tort law. To state an IIED claim, a plaintiff must plausibly allege the existence of (1) extreme and outrageous conduct, (2) an intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *See Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993). To meet this standard, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized" society. *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303 (1983).

As the district court correctly reasoned, Specht's allegations cannot "even approach[]" this standard. For one thing, although Specht frames the alleged behavior as an "outrageous violation of the public's trust," he cites no authority for the proposition that what happened to him was "*utterly intolerable* in a civilized community." *Murphy*, 58 N.Y.2d at 303 (emphasis added). What happened to him simply did not rise to that level. Finally, we observe that Specht's amended complaint levels only conclusory allegations that he suffered emotional distress, allegations that are insufficient to state a claim.

## CONCLUSION

For the foregoing reasons, the district court's dismissal of Specht's First Amendment retaliation claim is **AFFIRMED** in part and **REVERSED** in part. The district court's dismissals of Specht's New York State Civil Service Law § 75-b claim and intentional infliction of emotional distress claim are **AFFIRMED**. We **REMAND** for further proceedings consistent with this opinion.