*Shara v. Maine-Endwell Cent. Sch. Dist.,*

# United States Court of Appeals
# For the Second Circuit

August Term 2020

Argued: March 15, 2021
Decided: August 18, 2022

No. 20-2068

---

JAMES SHARA,

*Plaintiff-Appellant,*

*v.*

MAINE-ENDWELL CENTRAL SCHOOL
DISTRICT,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of New York
No. 20-cv-41, Thomas J. McAvoy, *Judge*.

---

Before:     POOLER, SULLIVAN, and PARK, *Circuit Judges*.

Plaintiff-Appellant James Shara, a former bus driver for Defendant-Appellee Maine-Endwell Central School District (the "School District"), appeals from the dismissal of his complaint by the United States District Court for the Northern District of New York (McAvoy, *J.*).  Shara contends that the School District violated his First Amendment rights by retaliating against him for speech he purports to have made in his capacity as a union leader.  In his district-court complaint, however, Shara merely alleged that he had argued with a School District mechanic – and later, a few School District officials – over the frequency with which bus safety issues should be reported.  He did not allege that the School District's existing policy permitted unsafe buses to remain on the roads, nor did he allege that daily reporting would improve public safety.  Because the claims in

Shara's complaint suggest nothing more than a workplace dispute between School District employees about internal reporting protocols, we conclude that he did not plausibly allege that he spoke as a citizen or that he spoke on a matter of public concern. We therefore hold that Shara has failed to allege that he engaged in speech protected under the First Amendment, and we **AFFIRM** the district court's dismissal of his complaint.

Judge Pooler dissents in a separate opinion.

AFFIRMED.

RONALD R. BENJAMIN, Binghamton, NY, *for Plaintiff-Appellant*.

ANGELO D. CATALANO, Coughlin & Gerhart, LLP, Binghamton, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiff-Appellant James Shara, a former bus driver for Defendant-Appellee Maine-Endwell School District (the "School District"), appeals from the dismissal of his complaint (the "Complaint") by the district court (McAvoy, *J.*). In the Complaint, Shara alleged that the School District suspended and ultimately terminated him for arguing with a School District mechanic – and later with School District officials – over the frequency with which bus inspection results should be reported. This, he argues, infringed his right to engage in speech protected by the First Amendment. But "when public employees make statements pursuant to their official duties, . . . the Constitution does not insulate their communications

2

from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak *as a citizen addressing matters of public concern*." *Id.* at 417 (emphasis added).

Here, the specific details provided in the Complaint suggest that Shara's arguments with fellow School District personnel were had in his capacity as a School District employee, not as a private citizen. Shara's primary argument to the contrary boils down to a series of (largely conclusory) assertions that he was speaking in his capacity as a union official. But even assuming these assertions are "entitled to be assumed true," *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), our Court has expressly rejected any "categorical[]" rule "that when a person speaks in his capacity as a union member, he speaks as a private citizen," *Montero v. City of Yonkers*, 890 F.3d 386, 399 (2d Cir. 2018). Likewise, while Shara now argues that his arguments with co-workers addressed matters of public concern insofar as bus-inspection reporting implicates the safety of all children riding the buses, he never alleged in his Complaint that the School District's preferred reporting policy resulted in unsafe conditions or that his proposal of daily reporting would have improved safety.

3

Accordingly, we conclude that Shara's Complaint does not support a plausible inference that he spoke as a citizen, or that he spoke on a matter of public concern. Because Shara has failed to establish that he engaged in protected speech, he cannot make out a prima facie case of First Amendment retaliation. We therefore **AFFIRM** the district court's dismissal of Shara's Complaint.

## I. Background

According to his Complaint, Shara was employed as a bus driver by the School District from June 2016 to January 2019. After he was elected Vice President of the bus drivers' union in May 2018, Shara began raising concerns, purportedly on behalf of union members, about matters including bus safety.

In October 2018, Shara spoke with Doug Miller, a transportation mechanic for the School District, about "safety issues" with two specific buses that had failed inspection. J. App'x at 18. In the discussions that ensued, the pair disagreed about the frequency with which the safety issues should be reported, with Shara insisting that the issues "be reported on a daily basis until corrected," and Miller maintaining that they "only need[ed] to be reported one time." *Id.* Ultimately, the disagreement was resolved by Mike Aubel, the School District's Director of Auxiliary Services, who agreed with Miller on the reporting protocol.

4

Nevertheless, Shara continued to raise the issue of reporting procedures over the following weeks, allegedly "acting solely in his role as Vice President of the Union with respect to safety issues and reporting requirements." *Id.* Nowhere in his Complaint, however, did Shara allege that unsafe buses were permitted on the road; that his preferred method of daily reporting would have resulted in faster, cheaper, or more effective repairs; or that he ever asserted as much in any of his conversations with Miller or Aubel.

After Shara refused to abide by Aubel's decision, the School District's Director of Personnel Relations, Randy Ray, told Shara that he would be charged with insubordination if he continued to insist on his preferred method of reporting. When Shara persisted, Aubel sent Shara a counseling memorandum in January 2019, urging him to "comply with expectations," including in "the discussions" he purported to be "carrying out in his capacity as Vice President of the Union," and warned that he could be disciplined or fired if his behavior continued. *Id.* at 18–19. Three days later, Shara was placed on administrative leave, and after another three days, he was terminated.

On January 10, 2020, Shara filed his Complaint in district court, alleging that the School District, a public employer, had violated his First Amendment rights

by firing him "for engaging in activity on behalf of the Union" and "advocating for employees [who were members] of the Union." *Id.* at 19. Shara sought compensatory damages, reinstatement, and attorney's fees. The School District filed a motion to dismiss, arguing that the court lacked subject-matter jurisdiction or, alternatively, that the Complaint failed to state a claim on which relief could be granted.

The district court dismissed Shara's Complaint with prejudice on June 12, 2020. The court determined that it had subject-matter jurisdiction to consider Shara's claims but held that he had failed to state a First Amendment retaliation claim. Specifically, the court concluded that when he argued with School District employees about the procedures for reporting bus safety issues, Shara had not spoken as "a private citizen on a matter of public concern" but rather as an employee on an employment matter "pursuant to his official duties." *Id.* at 8–9. Shara timely appealed.

## II.    Standard of Review

We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), *see Montero*, 890 F.3d at 394, "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff,"

6

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). We need not, however, accept bare legal conclusions included in a plaintiff's complaint. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and provide more than a "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (internal quotation marks and alterations omitted).

## III.    Applicable Law

To make out a "prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (internal quotation marks omitted). This Court and the Supreme Court have long recognized that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Janusaitis v. Middlebury Volunteer Fire Dep't*,

7

607 F.2d 17, 25–26 (2d Cir. 1979). So in assessing the first prong of the retaliation test – whether a public employee's speech is protected – we must consider "two separate subquestions": (1) whether the employee "spoke as a citizen rather than solely as an employee," and (2) whether he spoke on "a matter of public concern." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks omitted). If either question is answered in the negative, our inquiry may end there. If both questions are answered in the affirmative, we may proceed to consider whether the employer "had an adequate justification for treating the employee differently from any other member of the general public based on the government's needs as an employer." *Id.* (citations omitted).

## A. Citizen Speech

Turning to the first subquestion, we recognize "two relevant inquiries to determine whether a public employee speaks as a citizen." *Montero*, 890 F.3d at 397. First, courts may consider whether the employee's speech falls outside of his official responsibilities; second, they may ask "whether a civilian analogue" to the employee's speech exists. *Id.* (internal quotation marks omitted); *see also Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203–04 (2d Cir. 2010) (explaining that submitting letters to a local newspaper or discussing politics with a coworker are forms of speech

8

with civilian analogues, while an internal communication pursuant to an employer's dispute-resolution policy is not). While this latter inquiry "may be of some help in determining" whether an employee speaks as a citizen, we have emphasized that the heart of our analysis is "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Montero*, 890 F.3d. at 397–98.

To determine whether a public employee speaks pursuant to his official duties, courts "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two," along with other contextual factors such as whether the plaintiff's speech "was also conveyed to the public." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). This objective, practical inquiry should take into account the fact that a public employee's speech "can be pursuant to" his "official job duties even though it is not required by, or included in, [his] job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203 (internal quotation marks omitted). As this Court has previously explained, speech may be "pursuant to" an employee's official duties when it is "part-and-parcel of" the employee's concerns about his ability to properly execute his duties. *Id.* (internal quotation marks omitted).

In performing this analysis, we find particularly instructive our prior decisions in *Montero* and *Weintraub*. Like the present case, *Montero* involved a First Amendment retaliation claim based on comments that a public employee alleged to have made in his capacity as a union official. Montero, a police officer and vice president of his local police union, alleged that he had suffered retaliation after he spoke at union meetings and criticized the close relationship between the union president and police commissioner; condemned the commissioner's decision to discontinue certain police units; and called for a no-confidence vote on the commissioner's continued tenure. *Montero*, 890 F.3d at 390–91. Based on its conclusion that Montero had made these statements pursuant to his official duties, the district court dismissed his First Amendment retaliation claims. *Id.* at 400. Reversing the district court's decision in part, we held that Montero's criticism of the commissioner's choice to cut certain units and his call for a no-confidence vote warranted First Amendment protection as statements on matters of public concern because Montero had alleged that the termination of police units would "endanger public safety." *Id.* We also explained that, "taking the amended complaint's allegations as true, Montero spoke in his role as a union officer, and his union speech was not composed of statements made as a 'means to fulfill' or 'undertaken

10

in the course of performing' his responsibilities as a police officer." *Id.* at 399

(quoting *Weintraub*, 593 F.3d at 203). However, we specifically confined this

holding to the facts alleged and declined to hold "categorically that when a person

speaks in his capacity as a union member, he speaks as a private citizen." *Id.*

In *Weintraub*, a public-school teacher twice reported a student to the school's

assistant principal after the student threw books at the teacher during class. 593

F.3d at 198–99. After the assistant principal decided not to discipline the student,

the teacher – Weintraub – told other teachers at the school about the incidents and

filed a formal grievance with his union representative. *Id.* at 199. When Weintraub

was later fired, he brought suit alleging that school and city officials violated his

First Amendment rights by retaliating against him for complaining to others and

filing the grievance. *Id.* We affirmed the district court's dismissal of Weintraub's

claims, concluding that his speech – which Weintraub asserted concerned the

safety of students and teachers – was "part-and-parcel of his concerns about his

ability to properly execute his duties." *Id.* at 203 (internal quotation marks

omitted). We explained that Weintraub's speech concerned his ability "to

maintain classroom discipline, which is an indispensable prerequisite to effective

teaching and classroom learning." *Id.* Filing a grievance about safety in his

classroom was thus undertaken in the performance of his "primary employment responsibility of teaching." *Id.* We observed that this analysis was bolstered by the fact that Weintraub's grievance through his union did not have a citizen analogue — a relevant consideration when analyzing whether he had spoken as a citizen. *Id.* Accordingly, we determined that Weintraub's grievance was employee speech, and thus unprotected by the First Amendment. *Id.* at 205.

## B. Matters of Public Concern

In addition to establishing that he spoke as a citizen and not as an employee, a plaintiff alleging a First Amendment retaliation claim must also show that he spoke on a matter of public concern. *Montero*, 890 F.3d at 399. "To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011)).

"Whether speech is on a matter of public concern is a question of law" that courts decide by "examining the content, form, and context of a given statement, as revealed by the whole record." *Id.* (internal quotation marks omitted). Courts may consider a speaker's motive as part of this analysis, although that factor is not dispositive. *See Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014). Likewise,

12

courts may consider the forum and manner in which an employee makes a statement. *See Specht v. City of New York,* 15 F.4th 594, 600 (2d Cir. 2021); *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020). While these factors are also nondispositive, we have suggested that internal workplace complaints – especially those "filed with an employer using an internal grievance procedure" rather than through a channel available to the public – are rarely made "to communicate to the public or to advance a political or social point of view beyond the employment context." *Agosto*, 982 F.3d at 95 (internal quotation marks omitted). This is because speech does not involve a matter of public concern when it "principally focuses on" the speaker's personal issues or speech "that is calculated to redress personal grievances," even if it also incidentally "touch[es] on a matter of general importance." *Montero*, 890 F.3d at 399–400 (internal quotation marks and citations omitted); *cf. Lynch v. Ackley*, 811 F.3d 569, 581 (2d Cir. 2016) (observing that "[l]abor versus management disputes . . . often have a strong flavor of 'personal grievance' notwithstanding that the personal grievance is shared by numerous employees").

For example, we recently held that a fire marshal's email to colleagues about his "take on the course of [an] investigation and his reaction to what he considered

inappropriate pressure from his supervisors" was not protected speech because neither the substance nor the intended audience "suggest[ed] that [the employee] sought to inform the public on a matter of political, social, or community interest." *Specht*, 15 F.4th at 601; *see also id.* (reasoning that "[i]f the email were ever released to the public, it would convey no information other than the fact that a single employee was upset by an incident that occurred in the workplace"). By contrast, however, we also determined that Specht (the fire marshal) *had* engaged in protected speech when he "expressed his views on the handling of the investigation of the fire outside" of his workplace, including to the New York City Department of Investigation, the City Comptroller's Office, representatives of the District Attorney's office, and the local press. *Id.* We explained that in *these* statements, Specht had "alleged that members of the FDNY worked to mask the cause of a serious fire" to protect a movie production company – implicating matters of public concern like "governmental malfeasance, public safety, . . . [and] the public fisc." *Id.* at 601–02.

Finally, although it is true that union-related speech *can* address a matter of public concern, we have "rejected the notion that all activities undertaken through a union *necessarily* become matters of public concern merely by virtue of their

14

collateral connection to the union." *Agosto*, 982 F.3d at 97 (emphasis added) (internal quotation marks omitted). Indeed, this Court found no public concern where a plaintiff filed a union grievance based on management's presence at a union meeting, deeming it a labor-management dispute. *See Lynch*, 811 F.3d at 581–82. Similarly, we found no public concern where a public-school teacher lodged several union grievances based on his manager's alleged failures to comply with a collective bargaining agreement and interference with union activities. *Agosto*, 982 F.3d at 95–97. In contrast, we found that a plaintiff *had* spoken on a matter of public concern at a union meeting when he criticized policy decisions of the police commissioner based on his belief that the decisions "were bad for the police force, bad for members of the [union,] and bad for the community," and would "endanger public safety." *Montero*, 890 F.3d at 400 (internal quotation marks omitted).

## IV.    Discussion

Guided by the body of precedent surveyed above, we conclude that Shara failed to plausibly allege either (1) that his statements to School District officials concerning bus safety reporting procedures occurred outside of his role as a school

bus driver, or (2) that he spoke on a matter of public concern. We will address each part of this analysis in turn.

First, while Shara alleged that he was "involved in negotiations concerning safety issues and other issues concerning the agreement between the [School] District and the Union," J. App'x at 16, and was "advocating on behalf of the Union members with respect to issues relating to bus safety," *id.* at 18, these broad conclusions do not align with his actual description of the speech at issue. In his Complaint, Shara merely alleged that he "convers[ed] with the [School District's] transportation mechanic, Doug Miller, regarding safety issues on two of the District's buses that failed inspection," and that those "discussions continued" as he insisted that "safety issues be reported on a daily basis until corrected" while Miller and Aubel maintained "that they only need to be reported one time." *Id.* Unlike the police officer in *Montero*, who alleged that he had spoken out at a union meeting against policy decisions that could affect community safety, 890 F.3d at 391, Shara nowhere alleged that his conversations with School District officials concerned policy decisions that affected the School District's mission or the local community. Rather, Shara merely asserted that he spoke in his union capacity. But his position as an officer of the union does not transform his employment-

16

related conversations into speech as a citizen. *See Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties."); *Montero*, 890 F.3d at 399. Moreover, the discussions detailed in Shara's Complaint simply reflected workplace disagreements about technical protocols for reporting bus inspection results. *Cf. Agosto*, 982 F.3d at 95 (explaining that a plaintiff had "not identif[ied] how [a] dispute . . . about an internal [collective bargaining agreement] procedure for altering teachers' planning periods is of political, social, or other concern to the New York City community rather than an internal dispute of interest to employees" (internal quotation marks and alterations omitted)).

We conclude that the discussions described in Shara's Complaint were conducted pursuant to his official work duties and constituted an "indispensable prerequisite" to the successful completion of his role as a bus driver. *See Weintraub*, 593 F.3d at 203. Because these conversations were "part-and-parcel of [Shara's] concerns about his ability to properly execute his duties," his speech was that of an employee. *Id.* (internal quotation marks omitted). The fact that there is no civilian analogue to this speech, since it occurred only in discussions with School

17

District officials in the workplace and possibly in the process of union negotiations, reinforces this conclusion. *See Montero*, 890 F.3d at 398.

While the dissent argues that "Shara's speech had a clear civilian analogue because he submitted a FOIL request to the state regarding public school bus safety inspections," Dissent at 14, Shara's FOIL request is a red herring for the simple reason that it is not the speech for which he was disciplined. According to Shara's own Complaint, he was disciplined for the "discussions" he had with "Miller," "Aubel," and "Ray." J. App'x at 18–19. Indeed, nowhere in the Complaint did Shara even mention his FOIL request – let alone allege that it was what got him suspended or ultimately fired. "While we construe pleaded facts in the light most favorable to the plaintiff, we can draw inferences based only on the facts actually alleged, and we are not free to speculate about unpleaded facts that might be favorable to the plaintiff." *Darby v. Greenman*, 14 F.4th 124, 130 (2d Cir. 2021). Taking Shara's allegations at face value, it is clear that the speech *for which he was actually disciplined* had no relevant civilian analogue: after all, Miller, Aubel, and Ray hardly constitute "an 'independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Jackler*, 658 F.3d at 241 (quoting *Weintraub*, 593 F.3d

18

at 204). Furthermore, the dissent's analysis of Shara's FOIL request would imply that when a public employee has been disciplined for unprotected speech, he can generate for himself a valid First Amendment claim simply by *later* engaging in protected speech on the same topic. But we have never so held, and we decline to do so here. Accordingly, we conclude that Shara has failed to plausibly allege that he was speaking as a private citizen in the conversations about bus-inspection reporting that led to his termination.

Moreover, even if it could be argued that Shara's conversations with Miller and Aubel about bus safety reporting constituted speech in his capacity as a private citizen, Shara's claim would still fail since he never alleged in his Complaint that his speech involved a matter of public concern.[1] Although Shara now attempts to portray himself as a sort of whistleblower on bus safety, *see* Shara Br. at 7–8, the allegations in his Complaint were much more pedestrian and

---

[1] To be sure, Shara argues for the first time on appeal that his discussions with Miller and Aubel were focused on "the safety of [the] [D]istrict's school buses carrying schoolchildren to and from school," and were designed to ensure that the School District "fulfill[ed] its responsibilities to provide safe buses every day, not just some days." Shara Br. at 14. But because such claims did not appear in the Complaint, they are not relevant to our present analysis. *See, e.g.*, *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal. The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal." (internal citations and alterations omitted)).

involved little more than an intramural dispute among school employees about the best way to report maintenance issues involving the School District's buses. Nowhere in his Complaint did Shara allege that the School District's reporting practice permitted unsafe buses to be out on the road or that Miller and Aubel were attempting to sweep needed bus repairs under the rug. *See Specht*, 15 F.4th at 601–02. Shara simply alleged that he preferred a reporting procedure whereby "safety issues [would] be reported on a daily basis until corrected," while Miller and Aubel favored a procedure that required them to be "reported one time." J. App'x at 18.[2]

Reporting policies, even when discussed in the context of union negotiations, generally fall into the category of workplace and union operations,

---

[2] The dissent contends that Shara's speech is a "paradigmatic example of speech on a matter of public concern" because it "concerned the safety of the workplace, the safety of the Maine-Endwell community's schoolchildren, and the safety of other motorists whose lives might be at risk of colliding with a school bus with faulty brakes or other mechanical issues." Dissent at 21. But the Complaint's allegations about Shara's speech speak solely to the reporting frequency of failed bus inspections. *See* J. App'x at 18. They say nothing about the operation of buses after failing inspections, much less about workplace safety or the safety of schoolchildren and other motorists. The dissent's extrapolation of potential downstream consequences from the actual subject matter of Shara's speech is not a "reasonable inference" to be drawn in Shara's favor. Instead, we take the relevant speech at face value as alleged by the plaintiff. *See Twombly*, 550 U.S. at 562 ("[W]hen a plaintiff . . . supplies facts to support his claim, we do . . . impose[] a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional action into a substantial one . . . ." (citation and alteration omitted)); *Darby*, 14 F.4th at 130 ("[W]e are not free to speculate about unpleaded facts that might be favorable to the plaintiff.").

which we have declined to treat as matters of public concern. *Cf. Agosto*, 982 F.3d at 95–97. So in contrast to *Montero*, where an officer spoke at a union meeting about policies that "were bad for the police force, bad for members of the [union,] and bad for the community" and would "endanger public safety," 890 F.3d at 400, or *Matthews*, where an officer complained to executive officers that an arrest quota policy in his precinct was "damaging to the NYPD's core mission," 779 F.3d at 169, Shara's back and forth with Miller and Aubel concerning the frequency of bus safety reports does not rise to the level of speech involving a matter of public concern. And we will not impute to such speech a public character merely because the employee is also a union officer. *See Montero*, 890 F.3d at 399.

Far from involving matters of "political, social, or other concern to the community," *id.* (citation omitted), Shara's spat with Miller and Aubel concerned an internal work dispute over paperwork that would not be of interest to the public. *See Specht*, 15 F.4th at 600–01; *Agosto*, 982 F.3d at 95–97. Put differently, while an exposé on unsafe buses might be of interest to the community at large, internal communications that pertain solely to the protocols for reporting bus safety inspection results are not aimed at – and would hardly be expected to attract the attention of – reporters or members of the public. *See Specht*, 15 F.4th at 600–

02. Shara's allegations clearly involved such internal communications, and for that reason cannot be said to involve a matter of public concern.

## V.   Conclusion

For the reasons discussed above, we **AFFIRM** the district court's decision.

POOLER, *Circuit Judge*, dissenting:

Are parents of students in the Maine-Endwell School District interested in knowing that two school buses failed inspection? Is the safety of schoolchildren, public employees, and motorists an issue the public is interested in? The answer to these questions is obviously yes, and that should have resolved this case.

Over "50 years ago, [the Supreme] Court declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering v. Bd. of Ed. of Township High School Dist. 205*, 391 U.S. 563, 568 (1968)). Speech concerning "information related to or learned through public employment" is protected by the First Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* at 236 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). In fact, "[t]here is considerable value. . . in encouraging, rather than inhibiting, speech by public employees." *Id.* "Government employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674 (1994). "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe*, 543 U.S. 77, 82

1

(2004). In reconciling these principles with the government's interest in the efficient administration of its public services, we have devised a two-part test: "to determine whether a public employee's speech is constitutionally protected, courts must determine both that the employee spoke as a private citizen and that the speech at issue addressed a matter of public concern." *Montero v. City of Yonkers*, 890 F.3d 386, 393 (2d Cir. 2018).

The majority strays from these well-established principles of public employee First Amendment rights. James Shara, a bus driver and union vice president, was fired for raising concerns regarding the reporting of public school bus safety issues. Shara spoke as a private citizen because he made these comments outside of the scope of his official responsibilities and in the context of his position as a union official. Shara's comments were on a matter of public concern because the safety of schoolchildren, public employees, and other motorists are subjects of general interest and of value to the public.

The majority also deviates from bedrock principles of civil procedure by failing to "draw all reasonable inferences" in Shara's favor, as required at the motion to dismiss stage. *Lynch v. City of New York*, 952 F.3d 67, 76 (2d Cir. 2020).

In doing so, the majority stifles discovery and prevents the court from learning information necessary to properly resolve this dispute.

Because I believe Shara has stated a case sufficient to survive the motion to dismiss, I respectfully dissent.

## I.   Factual Background

The majority leaves out the following key facts, which are set out in Shara's complaint and are salient as to why his First Amendment rights were infringed. After Shara's fall 2018 discussions about bus safety with various members of the School District management, Randy J. Ray, director of personnel relations for the School District, "indicated" that Shara would be charged with insubordination. App'x at 18 ¶ 18. Joseph W. Beasley, a labor relations specialist for the union, informed the School District that Shara could raise safety issues during union negotiations given Shara's position as the union's vice president.

Matters escalated in January 2019. On January 3, Shara met with Aubel; Miller; Jeff L'Amoreauz, assistant superintendent of schools; Darleen Fernquist, head bus driver; Beasley; and Fred Sperry, union president. Aubel summarized the meeting in a January 4, 2019 memorandum. Importantly, the memorandum noted that Shara was asked if he had "received [his] FOIL Request [seeking]

3

information from Albany regarding [the School District's] inspections during October." App'x at 29.

On January 7, the School District placed Shara on administrative leave. Three days later, the School District fired him. The union filed an improper practice charge with the New York State Public Employment Relations Board ("PERB"), which sought, in part, Shara's reinstatement and that the School District "cease and desist" from actions violative of labor laws. App'x at 25. The PERB proceeding appears not to have been yet resolved.

Shara filed this action on January 10, 2020. The School District moved to dismiss, arguing that the action was barred by the collateral estoppel doctrine because of the PERB proceeding and that Shara failed to state a First Amendment retaliation claim. The district court dismissed the complaint with prejudice on June 12, 2020. It denied the School District's arguments based on the collateral estoppel doctrine because PERB had not yet rendered a decision. It nonetheless granted the motion to dismiss for failure to state a claim, concluding that Shara failed to allege that the School District terminated him because he spoke as a private citizen on a matter of public concern. The district court relied on Shara's statement in his complaint that Beasley informed the district that Shara had

4

"every right to bring up workplace concerns regarding safety issues during [u]nion negotiations." *Shara v. Maine-Endwell Cent. Sch. Dist.*, No. 3:20-CV-41 (TJM/ML), 2020 WL 3128541, at *4 (N.D.N.Y. June 12, 2020) (citing App'x at 18 ¶ 20). The district court characterized Shara's complaint as one regarding "the procedure to notify his employer about unsafe bus conditions," and reasoned that, "[e]ven if the speech grew partly from [Shara's] role in the union, the speech still addressed a matter of job performance and requirements, and not an issue that concerned the public." *Id.*

## II.   Public Employee Speech Under the First Amendment

In evaluating a First Amendment retaliation claim, we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Pickering*, 391 U.S. at 568. "It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 231.

5

In *Pickering*, the Supreme Court observed that "[t]eachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S. at 572; *see also Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (recognizing that "[t]he same is true of many other categories of public employees"). In *San Diego v. Roe*, the Court again noted that public employees "are uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large." 543 U.S. at 80.

## A. Speech as a Private Citizen

Under the First Amendment, "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. Here, Shara's comments, taken in the light most favorable to him, are "citizen speech" on a matter of "public concern."

In *Matthews*, "we identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether 'the speech fall[s] outside of the employee's official responsibilities,' and (2) whether 'a civilian analogue exists.'" *Montero*, 890 F.3d at 397 (quoting *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015)) (alterations in original).

Official Responsibilities

In order to determine whether "speech falls outside of the employee's official responsibilities," we consider "whether the employee's speech was 'part-and-parcel of [the employee's] concerns about his ability to properly execute his duties.'" *Montero*, 890 F.3d at 398 (quoting *Weintraub v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010)).

In *Montero*, a Yonkers police officer and former union vice president appealed from the district court's dismissal of his complaint raising a First Amendment retaliation claim. *Id.* at 390. We affirmed the district court's dismissal on qualified immunity grounds but vacated the dismissal as to defendant Keith Olson, the union president. Montero's complaint alleged that Olson retaliated against him after he criticized Olson's close relationship to the then-police commissioner because of that commissioner's decision to

7

"discontinue several police units . . . [which] would adversely affect the [police department, the union,] and the surrounding community." *Id.* at 391. Montero also called for a no-confidence vote against the police commissioner. *Id.* Montero alleged that about one month after he called for the vote, the defendants "conducted an unauthorized investigation focused on Montero's use of overtime slips," which resulted in Montero's transfer the next month to a less desirable division. *Id.* at 391-92. Then, about six months after he called for the vote, defendants "conducted a second unauthorized investigation . . . for insubordination." *Id.* at 392. Ultimately, about three years later, Montero was expelled from the union. *Id.* at 392-93. In partially vacating the district court's dismissal, our Circuit reasoned that "Montero made his remarks as union vice president, a role in which he was not required to serve." *Id.* at 398. We concluded that "taking the amended complaint's allegations as true, Montero spoke in his role as a union officer, and his union speech was not composed of statements made as a means to fulfill or undertaken in the course of performing his responsibilities as a police driver." *Id.* (internal quotation marks omitted).

In *Matthews v. City of New York*, which we relied on in *Montero*, we considered whether a police officer spoke as a citizen when he criticized an

arrest-quota policy to precinct commanders. 779 F.3d at 169. We "concluded that Matthews's complaints were not what he was employed to do" because he "had no role in setting policy; he was neither expected to speak on policy nor consulted on formulating policy," and "ordinary citizens were also regularly provided the opportunity to raise issues with the precinct commanders." *Montero*, 890 F.3d at 397 (quoting *Matthews*, 779 F.3d at 174, 176).

And in *Weintraub v. Board of Education*, a teacher filed a grievance through his union regarding his school's failure to discipline a student that assaulted him. 593 F.3d at 198-99. We concluded that Weintraub did not speak as a private citizen because his grievance was "pursuant to his official duties because it was part-and-parcel of his concerns . . . as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (internal quotation marks omitted). Filing a union grievance was not a "form or channel of discourse available to non-employee citizens." *Id.* at 204.

The majority concludes that Shara failed to plausibly allege that his statements to School District officials concerning bus safety reporting occurred outside of his role as a school bus driver. Maj. Op. at 15-16. The majority's

9

reliance on *Garcetti* is misguided. There, Richard Ceballos, a police officer, was fired for engaging in speech that was required as part of his job. *See Garcetti*, 547 U.S. at 421 ("The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy."). The majority, misapplying *Garcetti*, wrongly construes Shara's speech as that of an employee simply because it touches on his duties. As in *Garcetti*, here Shara's comments "concerned the subject matter of [his] employment, . . . but this, too, is nondispositive." *Id.* "The First Amendment protects some expressions related to the speaker's job." *Id.* The fact that Shara expressed his comments internally, "rather than publicly, is not dispositive." *Id.* at 420-21. "Employees in some cases may receive First Amendment protection for expressions made at work." *Id.*

Shara's comments were made as a private citizen because they went beyond the scope of his job duties as a bus driver. Specifically, Shara believed that the frequency of reporting school bus mechanical issues was too low and that such issues should have been reported more often. App'x at 18 ¶ 16 ("That the discussions continued whereby plaintiff and Mr. Miller had disagreements concerning the reporting of the safety issues, with the plaintiff insisting that safety issues be reported on a daily basis until corrected and Mr. Miller and Mike

10

Aubel, Director of Auxiliary Services for the School District, asserted that they only need to be reported one time."). Shara's responsibilities included reporting whether a bus he drove was experiencing a safety issue, but his comments went to the frequency of reporting by all bus drivers. "Such policy-oriented speech was neither part of [Shara's] job description nor part of the practical reality of his everyday work." *Matthews*, 779 F.3d at 174. Shara's comments went beyond stating he felt unsafe driving school buses with mechanical issues; instead, he criticized a district-wide policy regarding how often mechanical issues are reported. Shara is thus similarly situated to the plaintiff in *Matthews*, who "had no role in setting policy," because Shara was solely employed by the School District as a bus driver. 779 F.3d at 174. Complaining of the frequency of bus safety reporting was "not what he was employed to do," nor "was it part-and-parcel" of his regular job. *Id.*

Of course, we would have a better sense of how Shara's speech went beyond the scope of his official responsibilities if this case proceeded to discovery in the regular course and we learned the day-to-day responsibilities of school bus drivers in the Maine-Endwell School District. In *Matthews*, the district court had initially granted New York City's motion to dismiss. *See Matthews v.*

11

*City of New York*, No. 12 Civ. 1354, 2012 WL 8084831, at *1 (S.D.N.Y. Apr. 12, 2012). However, we vacated and remanded, holding that "[t]he record in this case is not yet sufficiently developed . . . to determine as a matter of law whether Officer Matthews spoke pursuant to his official duties when he voiced the complaints." *Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. 2012). We stated that discovery was necessary as to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* (internal quotation marks omitted).

After discovery in *Matthews*, the district court granted the City's motion for summary judgment. Matthews appealed. Presented with a fully developed factual record, we vacated and remanded the district court's grant of summary judgment. In doing so, we looked to the NYPD Patrol Guide, produced during discovery, that outlined the "Duties and Responsibilities" of police officers. *See Matthews*, 779 F.3d at 171. We concluded that Matthews' speech addressed a "precinct-wide policy." *Id.* at 174.

Here, in contrast, the record is insufficiently developed for us to understand what Shara's official responsibilities were. I would venture a guess that criticizing a district-wide policy was not "part of [Shara's] job description"

12

nor "part of the practical reality of his everyday work." *Id.* So just how much of

Shara's speech is "part-and-parcel" of the responsibilities of a public school bus

driver? Unfortunately, we cannot and will not learn the answer to that question

because the majority, instead of construing the facts in the manner most

favorable to Shara, improperly draws every inference in favor of the School

District. *See Lynch*, 952 F.3d at 76-77 (vacating a Rule 12(b)(6) dismissal where the

district court did not accept the plaintiff's allegations as true).

Civilian Analogue

Speech has a "relevant civilian analogue" if it is made through "channels

available to citizens generally." *Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011).

"[A]n indicium that speech by a public employee has a civilian analogue is that

the employee's speech was to an 'independent state agency' responsible for

entertaining complaints by 'any citizen in a democratic society regardless of his

status as a public employee.'" *Id.* at 241 (quoting *Weintraub*, 593 F.3d at 204).

In *Garcetti*, the Supreme Court provided two examples of civilian

analogues: "writing a letter to a local newspaper" and "discussing politics with a

co-worker." 547 U.S. at 423-24. Our own precedents provide other examples. In

*Jackler*, we considered a police officer's First Amendment retaliation claim where

13

the officer had been fired for refusing to retract a truthful police incident report. 658 F.3d at 234. We held that Jackler's refusal to retract the report had a civilian analogue because a non-employee citizen may also refuse to retract a truthful police report. *Id.* at 241. In *Weintraub*, on the other hand, we found the teacher's speech unprotected in part because the "lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." 593 F.3d at 204. And in *Matthews*, we concluded that because Matthews "did not follow internal grievance procedures, but rather went directly to the Precinct commanders" he "chose a path that was available to ordinary citizens." *Matthews*, 779 F.3d at 175-76.

Here, Shara's speech had a clear civilian analogue because he submitted a FOIL request to the state regarding public school bus safety inspections. *See* App'x at 28-29 (counseling memorandum stating that Shara did not answer whether he had "received [his] FOIL Request information from Albany regarding our inspections during October"). The majority attempts to minimize Shara's FOIL request. And for good reason, as a FOIL request is the epitome of a civilian analogue. Any citizen concerned about how often school bus

14

maintenance issues were being reported could file a FOIL request seeking such information. By filing a FOIL request, Shara "chose a path that was available to ordinary citizens," *Matthews*, 779 F.3d at 175–76, instead of solely following internal grievance procedures. The majority counters that this approach to Shara's FOIL request would "imply that when a public employee has been disciplined for unprotected speech, he can generate for himself a valid First Amendment claim simply by *later* engaging in protected speech on the same topic. Maj. Op. at 19. This concern is unwarranted because Shara engaged in the protected speech *before* he was disciplined. The counseling memorandum sent to Shara on January 4, 2019 already references his FOIL request, and he was not placed on administrative leave until January 7. *See* App'x at 29.

Furthermore, Shara's comments were made in his capacity as the union vice president. *See* App'x at 17 ¶ 13 ("[S]ubsequent to May of 2018, [Shara] began carrying out his responsibilities as Vice President of the Maine-Endwell Transportation Association, which included numerous conversations with School District officials in his capacity as Vice President of the Union."); App'x at 18 ¶ 17 ("That over the next several weeks, discussions ensued with plaintiff acting solely in his role as Vice President of the Union with respect to safety

15

issues and reporting requirements."). In *Montero*, we concluded that, taking "the amended complaint's allegations as true," "when Montero spoke in his capacity as a union member, he spoke as a private citizen." *Montero*, 890 F.3d at 399. We credited Montero's allegation that he spoke in his role as a union officer and that his union speech was not "composed of statements made as a 'means to fulfill' or 'undertaken in the course of performing'" his official responsibilities. *Id.*

The Supreme Court has held that when unions speak, they "speak[] for the *employees*, not the employer." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2474 (2018) (emphasis in original). And a number of our sister circuits have already adopted this rule in the context of public employee speech. *See Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) ("We . . . hold that speech in connection with union activities is speech 'as a citizen' for purposes of the First Amendment."); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1059-60 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union."); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006) ("Because [an employee's] comments that precipitated the adverse action taken against him were made in his capacity

16

as a union representative, rather than in the course of his employment as a deputy sheriff . . . [Garcetti] is inapposite.").

Recently, another of our sister circuits concluded that statements made by a bus driver, who served as union president, to a local television station while wearing his work uniform and driving a bus on his employer's property in the middle of his workday were made in his capacity "as a citizen." *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 136 (1st Cir. 2022). There, Christopher Bruce gave a television interview regarding the union's efforts to mobilize against budget cuts to regional transportation authorities. *Id.* at 133. The First Circuit reversed the district court's grant of summary judgment to the defendant transportation agency because a reasonable juror could have found that Bruce was speaking to the television station "in his capacity as a union president." *Id.* at 138. The First Circuit noted it was not dispositive that Bruce "was interviewed in uniform, while driving a bus on [his employer's] property in the middle of his workday" because "*Garcetti* is clear in holding that there is a distinction between speech made 'pursuant to [an employee's] official duties' and speech made 'at work.'" *Id.* at 137 (quoting *Garcetti*, 547 U.S. at 420-21). Moreover, the First Circuit concluded, "the fact that the [television network] was seeking comments from

17

[transit authority] drivers in their role as drivers" did not suffice to show that Bruce himself was speaking in that capacity rather than in his capacity as a union president. *Id.* at 138.

Here, the majority errs in failing to take as true Shara's allegation that he spoke in his role as a union officer. *See* Maj. Op. at 16 ("First, while Shara alleged that he was 'involved in negotiations concerning safety issues and other issues concerning the agreement between the [School] District and the Union,' and was 'advocating on behalf of the Union members with respect to issues relating to bus safety,' these broad conclusions do not align with his actual description of the speech at issue." (citations omitted)). Instead, the majority improperly creates a new hurdle for similarly-situated plaintiffs by concluding that Shara's complaint was insufficient because it failed to include the magic words that his conversations with officials "concerned policy decisions that affected the School District's mission or the local community." Maj. Op. at 16. It does not require much of a logical leap to infer that discussions regarding school bus safety between a union official and school district officials implicate the School District's mission of caring for the safety of its public employees and schoolchildren or the community's interest in the same. *See, infra*, section II.B.

18

Shara's position as a union official and his allegations that he "act[ed] solely in his role as Vice President of the Union" strongly supports an inference that Shara was speaking on an issue broader than one "ordinarily within the scope of [his] employee[] duties." *Lane*, 573 U.S. at 240.

## B. Public Concern

The majority's gravest error, however, lies in its conclusion that Shara's speech was not on a matter of public concern. Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Id.* at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* at 241 (quoting *Connick*, 461 U.S. at 147-48).

"The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." *Jackler*, 658 F.3d at 236. "To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id.* (quoting *Connick*, 461 U.S. at 146).

19

"Speech that, although touching on a topic of general importance, primarily concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Id.* at 236 (internal quotation marks and citations omitted).

Shara's comments were clearly on a matter of public concern. Shara was concerned with the frequency of reporting safety issues regarding the School District's buses used to transport schoolchildren. *See* App'x at 18 ¶¶ 15-17. Shara's speech began on October 26, 2018, when he discussed safety issues with Miller, regarding "two of the District's buses that failed inspection." App'x at 18 ¶ 15. Those discussions regarding the frequency of reporting safety issues continued, "with [Shara] insisting that safety issues be reported on a daily basis until corrected and [Miller] and [Aubel] assert[ing] that they only need to be reported one time." App'x at 18 ¶ 16. Further, a labor relations specialist working with the union told the School District contemporaneously that Shara "had every right to bring up workplace concerns regarding safety issues." App'x at 18 ¶ 20.

We have held that the safety of public employees is, indeed, a matter of public concern. *See, e.g., Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir.

20

2002) ("[S]afety in the workplace is a matter of public concern."). Common sense dictates that Shara's speech concerned the safety of the workplace, the safety of the Maine-Endwell community's schoolchildren, and the safety of other motorists whose lives might be at risk of colliding with a school bus with faulty brakes or other mechanical issues, such as the two buses that had already failed inspection. Surely speech on such a topic is the paradigmatic example of speech on a matter of public concern. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 164 (2d Cir. 2006) ("[T]he possible insufficiencies of the school's response implicate the health, welfare and safety of young students, all of which are matters of importance to the public.").

The majority inexplicably does not think so. Instead, the majority argues that Shara failed to "allege that the School District's reporting practice permitted unsafe buses to be out on the road or that Miller and Aubel were attempting to sweep needed bus repairs under the rug." Maj. Op. at 20. Not so. Shara's complaint specifically alleges that the discussions with Miller involved "safety issues on two of the District's buses that failed inspection." App'x at 18 ¶ 15. Shara alleges he "insist[ed] that safety issues be reported on a daily basis until corrected." App'x at 18 ¶ 16. Again, the majority faults Shara for not including

21

magic words it prefers. But the only way to read Shara's allegations regarding safety issues on buses that failed inspection is to conclude that such buses were indeed "out on the road," and that in not reporting problems daily until corrected, district officials were "attempting to sweep needed bus repairs under the rug." An issue reported only once is far more likely to fly under the radar than one that is reported daily. Shara's request that bus safety issues be reported daily indicates that his concern was on buses that failed safety inspections but continued to be used to transport schoolchildren and public employees.

The majority continues its improper practice of drawing inferences against Shara when it states that "Shara's spat with Miller and Aubel concerned an internal work dispute over paperwork that would not be of interest to the public." Maj. Op. at 21. The majority conjures a "paperwork" dispute out of thin air. There is no allegation in the complaint that Shara was concerned about paperwork. In fact, the majority's position is nonsensical: if the district adopted Shara's preferred policy that bus safety issues be reported daily, that would create more "paperwork" for himself and his fellow drivers, not less. "To identify matters of public concern, 'we consider the motive of the speaker.'" *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021) (quoting *Golodner v.*

22

*Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)). Typically, employees do not seek more work from management, so Shara's "motive" in requesting that bus safety issues be reported more frequently is another indication that he was actually concerned with the presence of unsafe buses on public roads. Similarly, it does not follow that Shara resorted to filing a FOIL request over an internal workplace dispute. Instead, Shara's FOIL request also supports an inference that he was speaking on a matter of public concern. Regardless, any workplace tension between Shara and Miller and Aubel does not transform Shara's speech into an ordinary workplace dispute because "an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large." *Id.*

Finally, the majority makes a confusing point that "an exposé on unsafe buses might be of interest to the community at large," but "internal communications that pertain solely to the protocols for reporting bus safety inspection results are not aimed at – and would hardly be expected to attract the attention of – reporters or members of the public." Maj. Op. at 21-22. If the fact that two of the School District's buses failed safety inspections but potentially remained in use transporting schoolchildren is not "an exposé on unsafe buses," then I am not sure what is. The majority assumes, without any basis in the

23

limited record before us, that the public would not be interested to know that two buses failed safety inspections or the process by which the School District manages its equipment responsible for carrying children to and from school. I think the opposite far more likely. But in any event, assuming the public would not be interested is hardly an appropriate basis to support dismissal when the procedural posture demands all facts and inferences be construed in Shara's favor.

Drawing all inferences in Shara's favor, as we must, his complaint clearly asserts that he was speaking out on matters of public safety: the quintessential matter of public concern. As aptly stated in *Munafo*: "If one needed to consult more than common sense, one would need look no farther than the existence of laws such as the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et. seq. (1994), and similar state laws, *see, e.g.*, N.Y. Lab. Law § 202 et seq. (McKinney Supp. 2001), to recognize that safety in the workplace is a matter of public concern." *Munafo*, 285 F.3d at 212.

For the reasons given above, I respectfully dissent.