*Long v. Byrne*

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

————————————

August Term, 2024

Argued: May 16, 2025      Decided: July 30, 2025

Docket No. 24-3080-cv

————————————

SAMANTHA LONG,

*Plaintiff-Appellant,*

— v. —

JESSICA BYRNE,  TOWN OF NEW LEBANON,

*Defendants-Appellees.*

————————————

B e f o r e:

LYNCH, PARK, and ROBINSON, *Circuit Judges.*

————————————

Plaintiff-appellant Samantha Long, who previously served as the Clerk of the Town Justice Court for the Town of New Lebanon, sues defendants-appellees the Town of New Lebanon and Jessica Byrne, a former Town Justice, alleging that they unlawfully fired her because she cooperated with an investigation by the

New York State Commission on Judicial Conduct (the "Commission") into Byrne's suspected judicial misconduct, in violation of Long's First Amendment rights and her rights under New York State Civil Service Law § 75-b. More specifically, Long alleges that she was fired because she, upon request, provided specific case files to a representative of the Commission, and because, after Byrne learned about the Commission's investigation, Long refused to discuss the investigation with Byrne. Long now appeals the Northern District of New York's (Mae A. D'Agostino, *J.*) dismissal of her claims. We vacate the district court's judgment and remand for further proceedings. Long's complaint adequately alleged that when she cooperated with the Commission's investigation she acted in her capacity as a private citizen, not pursuant to her work responsibilities as Court Clerk.

———————

PHILLIP G. STECK, Cooper Erving & Savage LLP, Albany, NY, *for Plaintiff-Appellant*.

STEPHEN M. GROUDINE, Murphy Burns Groudine LLP, Loudonville, NY, *for Jessica Byrne, Defendant-Appellee*.

EARL T. REDDING, Roemer Wallens Gold & Mineaux LLP, Albany, NY, *for The Town of New Lebanon, Defendant-Appellee*.

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellant, Samantha Long, filed a lawsuit in the United States District Court for the Northern District of New York against defendants-appellees the Town of New Lebanon and Jessica Byrne, a former Town Justice, (the "defendants") alleging violations of Long's First Amendment free speech

2

rights and her rights under New York State Civil Service Law § 75-b, which protects whistleblowers from retaliation in certain circumstances. She asserts that defendants unlawfully terminated her employment as the Clerk of the Town Justice Court in retaliation for her cooperation with an investigation into Byrne's purported misconduct by the New York State Commission on Judicial Conduct (the "Commission").

The district court (Mae A. D'Agostino, *J.*) dismissed Long's claims for failure to state a claim, concluding that the First Amendment did not protect her conduct because her actions "formed part of her official duties and did not constitute protected citizen speech." *Long v. Byrne*, No. 24-cv-466, 2024 WL 4710695, at *5 (N.D.N.Y. Nov. 6, 2024). The court then declined to exercise supplemental jurisdiction over Long's Section 75-b claim. We disagree with the court's dismissal of Long's claims. Accordingly, we VACATE the judgment of the district court and REMAND the case for further proceedings.

## BACKGROUND

### I. Factual Background

We take the following facts from the amended complaint, which we accept

3

as true, and we draw all reasonable inferences in Long's favor. *See, e.g., Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023).

In May 2019, Long was appointed as the Clerk of the New Lebanon Town Justice Court by the New Lebanon Town Board, with the advice and consent of the Town Justices. Until she was terminated from that position in early 2024, Long was consistently given "high praise" for her work as Court Clerk, including by Byrne, Appellant's App'x 23–24 at ¶¶ 10–12, who directed the "means and manner" of her employment, *id.* 29 at ¶ 50. At one point, Byrne purportedly stated that Long was "the best Court Clerk she ever had," and, in one of her performance evaluations, submitted a perfect score for Long. *Id.* 23–24 at ¶¶ 11–12.

The events underlying the unraveling of Long's tenure as Court Clerk began during the summer of 2023. In July of that year, a Commission representative arrived at Long's office and requested "case files on [four] individuals." *Id.* 24 at ¶ 15. An anonymous judicial ethics complaint had been filed against Byrne, and the Commission's representative sought those case files because they were connected to its investigation into Byrne's purported misconduct as Town Justice. The representative advised Long that "[Long] was

4

not permitted to discuss the investigation with anyone, including . . . Byrne." *Id.* at ¶ 16.

Long "turned over all the material" that the representative requested. *Id.* at ¶ 15. She asserts that although she was not an employee of the Commission and her duties as the Court Clerk did not "require her to report to the Commission," *id.* 27 at ¶ 37, she cooperated with the representative's request in an "effort to comply with the laws, rules, and regulations of the [Commission]," *id.* 29–30 at ¶ 55. In fact, Long asserts that she was "required by law" to comply with the Commission's requests. *Id.* 24 at ¶ 15. She further alleges that in providing the requested documents, she was "acting in the same manner as any private citizen to whom the Commission . . . inquired." *Id.* 28 at ¶ 38.

A few months later in late November, Byrne confronted Long about the Commission's investigation. Long alleges that Byrne "came into the office angry" because Long "did not tell her who [had] filed the complaint against her." *Id.* 24 at ¶ 17. Long responded that she did not know the complainant's identity, and that, in any event, she had been "advised by the representative of the Commission not to speak of it to anyone[,] including . . . Byrne." *Id.* Long also asserts that she was not required to respond to Byrne because "her job duties [did

5

not] require her to advise a Town Justice as to the requirements of the Commission"; knowledge of those requirements was instead Byrne's responsibility. *Id.* 27 at ¶ 37. Shortly thereafter, at Byrne's impetus, the Town Board terminated Long's employment as Court Clerk.[1]

## II. Procedural History

On April 3, 2024, Long sued defendants seeking reinstatement and/or damages. She asserts that defendants violated her First Amendment rights and her rights under New York State Civil Service Law § 75-b when they unlawfully fired her in retaliation for her cooperation with the Commission's investigation. On defendants' motion, the district court dismissed Long's complaint. *See Long*, 2024 WL 4710695, at *1, *6–7.

On the First Amendment retaliation claim, the district court concluded that

---

[1] Long's complaint also includes other allegations related to Byrne's conduct. For example, Long alleges that the New York State Police accused Byrne of check fraud. Typically, at the beginning of each month, Long would write "end of the month checks" for Justice Byrne and Justice Nevers, one of the other Town Justices. Appellant App'x 24 at ¶¶ 18–19. After reviewing the checks that Long wrote at the beginning of December, the Town Supervisor suspected that Judge Nevers's signature was forged. The Town Supervisor noticed that Judge Nevers's signature appeared abnormal and confirmed with Judge Nevers's wife that, due to a recent stroke, he was unable to sign documents. After the New York State police accused Byrne of check fraud, Byrne directed Long to stop issuing the end of month checks. Those allegations are tangential to Long's appeal, and we need not discuss them further.

6

Long did not engage in constitutionally protected speech. *See id.* at *4–6. To reach that conclusion, the court applied the two-step *Garcetti* framework, which courts use to determine whether a public employee's speech is protected. That framework requires courts to assess: (1) "whether the employee spoke as a citizen on a matter of public concern," and if so, (2) "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The court reached only the first part of the first prong of the *Garcetti* inquiry, concluding that Long's conduct was not protected because she was acting pursuant to "her official duties," and therefore acted as an employee and not as a citizen. *Long*, 2024 WL 4710695, at *6 n.3

More specifically, as to Long's production of documents, the court explained that the "sole reason that the Commission's representative approached [Long]—at [her] office—was because, as Town Court Clerk, she had access to the case file documents at issue." *Id.* at *5. The court emphasized that Long did "not allege that she sought out the Commission to report misconduct as a private citizen," but that instead the Commission's representative came to her at her office. *Id.* Moreover, it pointed out that Long did not "allege that she provided

the documents out of a personal sense of obligation to further a matter of public concern, but merely because it was required by law." *Id.* (internal quotation marks omitted).

As it relates to Long's refusal to answer Byrne's inquiries about the Commission's investigation, the district court reasoned similarly. The court explained that Long's refusal did not constitute protected citizen speech because "[a]ll of [her] alleged speech occurred at work, during work hours, concerning matters solely within the province of her responsibilities as Town Court Clerk." *Id.*

Finally, because there were no surviving federal-law claims, the district court declined to exercise supplemental jurisdiction over Long's Section 75-b claim. *Id.* at *6. Long now appeals, arguing that the district court erred in concluding that she acted pursuant to her official job duties when she produced documents that the Commission requested and refused to answer Byrne's questions about the Commission's investigation.

## DISCUSSION

### I. Standard of Review

"We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss for

8

failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) (internal quotation marks omitted). "The complaint's allegations, however[,] must be plausible on their face, a standard that asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (alterations adopted) (internal quotation marks omitted). As long as "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," then the complaint will survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.     First Amendment Retaliation

### A.     Legal Standard

To state a First Amendment retaliation claim, a plaintiff must plausibly allege that: "(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between [the] adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). The district court in this case addressed only whether Long's speech was protected by the First Amendment. We therefore do not reach the latter two elements of her First

Amendment retaliation claim.

When asserting a First Amendment retaliation claim, public employees, like Long, face greater burdens than private citizens to demonstrate that their speech is protected by the First Amendment, because "[t]he government as employer . . . has far broader powers [to restrict speech] than does the government as sovereign." *Garcetti*, 547 U.S. at 418 (internal quotation marks omitted). That's because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions" to ensure "the efficient provision of public services." *Id.* "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. . . . [because the government employer] ha[s] a job to do," and that job will be made significantly more difficult, if not impossible, if the government employer is unable to remediate an employee's gross insubordination. *Waters v. Churchill*, 511 U.S. 661, 675 (1994). That said, "a citizen who works for the government is nonetheless a citizen." *Garcetti*, 547 U.S. at 419. The First Amendment, therefore, still "limits the ability of a public employer to leverage the employment relationship to restrict,

10

incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.*

The test that the Supreme Court has developed to determine whether a public employee's speech is protected by the First Amendment is designed to balance those competing interests. To demonstrate that her speech or conduct is protected by the First Amendment, a public employee must first establish that she was "speaking as [a] citizen[] about matters of public concern." *Id.* That inquiry "in turn encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks omitted).

If the employee satisfies those requirements, then the First Amendment is implicated, but more is required to establish that the Amendment protects the public employee's speech. The court must also assess whether the government employer "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (internal quotation marks omitted). That assessment requires the court to "balance . . . the interests of the

11

[employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). If the balance tips in the employee's favor, the First Amendment will protect the public employee's speech.

In this case, the district court addressed only whether Long spoke as a citizen, concluding that her claim failed at the threshold. Accordingly, we focus only on that question.

For a public employee to demonstrate that she spoke as a citizen, she must establish that her speech fell "outside of [her] official responsibilities." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 83 (2d Cir. 2022). To determine whether a public employee has met that burden, a court must "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two, along with other contextual factors such as whether the plaintiff's speech was also conveyed to the public." *Id.* (internal quotation marks omitted). "[S]peech may be pursuant to an employee's official duties when it is part-and-parcel of the employee's concerns about [her] ability to properly execute [her] duties." *Id.* (internal quotation marks omitted). Ultimately,

12

whether a public employee's speech was "pursuant to" her job duties is a "practical" inquiry, and a court should not "constru[e] a government employee's official duties too narrowly" by relying solely on a formal job description. *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010) (internal quotation marks omitted).

A court may also consider whether a civilian analogue to the employee's speech exists. The relevant question is whether the employee's speech took "a form" or used a "channel of discourse available to non-employee citizens." *Id.* at 203–04 (contrasting speech that "took the form of an employee grievance" with "a schoolteacher's letter to a local newspaper" and "discussions of politics with a co-worker" because the former, unlike the latter two, has no civilian analogue) (alterations adopted) (internal quotation marks omitted). The existence of such an analogue may suggest that the government employee was speaking as a citizen, not as an employee, but it is not a dispositive consideration. *See id.* "[T]he heart of [the public employee speech] analysis is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Shara*, 46 F.4th at 83 (internal quotation marks omitted).

The citizen speech test acts as a filter; it automatically removes from the

First Amendment's ambit speech that is most likely to disrupt the efficient operation of government and least likely to implicate the employee's interest in speaking as a citizen on a matter of public concern. Under the test, speech that falls within the scope of a public employee's work duties does not implicate the First Amendment regardless of whether the government employer has an adequate justification for treating the speech differently from citizen speech. The government speech test is designed to help ensure the efficient operation of government, and a rule that prohibits government employers from disciplining employees for misconduct within the scope of their work duties would effectively nullify that aim.

Take, for example, *Anemone v. Metropolitan Transportation Authority*, 629 F.3d 97 (2d Cir. 2011). There, the plaintiff, who was the Director of Security at the Metropolitan Transportation Authority ("MTA"), alleged that he was unlawfully terminated for, among other alleged speech acts, reporting suspected corruption by MTA officials to the Queens District Attorney's ("DA's") office. *Id.* at 99, 101–02. In the course of his everyday work, the plaintiff in that case was "expected to and did cooperate with various investigatory agencies, including the Manhattan and Queens District Attorneys' offices." *Id.* at 99. Indeed, in

addition to being involved in at least one previous corruption investigation at the MTA, the plaintiff "testified that as Director of Security at the MTA, he regularly interacted with District Attorneys' offices and viewed cooperating with these offices as among his duties." *Id.* at 100, 116.

Based on those facts, we concluded that there was "no question" that the plaintiff's contacts with the Queens DA's office were "clearly pursuant to [his] official duties so as to fall squarely within *Garcetti*." *Id.* at 116. Those communications, therefore, did not implicate the First Amendment. *Id.* at 116–17. We also rejected the plaintiff's arguments that, after the investigation was assigned to another department, his subsequent discussions with the Queens DA were protected because they were technically "outside the chain of command," given that his supervisor had removed him from the investigation. *Id.* at 116 (internal quotation marks omitted). We reasoned that "[w]hen a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen." *Id.*

If the plaintiff's supervisor in *Anemone,* who "was entrusted with ensuring

15

that [plaintiff's] official communications with investigating agencies . . . were accurate, demonstrated sound judgment, and promoted the employer's mission," did not have the authority to take corrective action with regard to the plaintiff's speech, she would not have been able to adequately perform her job. *Id.* (alterations adopted) (internal quotation marks omitted). In such a scenario, the plaintiff in *Anemone* could have, without penalty, initiated his own, fruitless investigations, wasting valuable agency resources; reported inaccurate information to investigating agencies, potentially sending them down the wrong path; or even misled investigators to protect his own corrupt actions. Such a breakdown in supervisory authority would have made it nearly impossible for the MTA to manage investigations into internal corruption, which could, in turn, have jeopardized the efficient operation of the entire agency. It is, therefore, with good reason that the government speech doctrine permits a government employer to regulate its employees' speech when that speech is pursuant to its employees' work duties.

It may seem that precluding from the First Amendment's balancing inquiry a public employee's speech made pursuant to her job duties risks leaving diligent employees vulnerable to corrupt employers. Since speech within a public

16

employee's work duties does not implicate the First Amendment, a public employee could be fired for simply doing her job, and the First Amendment would offer no protection. For example, in *Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012) (a case that we return to in greater detail later), the plaintiff, a former payroll clerk typist for the Katonah-Lewisboro Union Free School District, was fired after she reported potential financial malfeasance in her office to her superiors. *See id.* at 302–04. We determined, based on evidence uncovered during discovery, that Ross's speech reporting that financial malfeasance did not implicate the First Amendment because she had confirmed, in deposition testimony, that "reporting pay irregularities to a supervisor," which included "reporting mistakes," was "one of her job duties." *Id*. at 306. She therefore could not recover under the First Amendment for her employer's alleged retaliation. *Id.* at 308.

Given that the "[e]xposure of official misconduct," like the reporting of an official's financial malfeasance, "is generally of great consequence to the public," *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotation marks omitted), it may seem that the First Amendment should protect employees like Ross who report suspected misconduct. There are, however, several good

reasons for precluding such speech from First Amendment protection.

First, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421–22. Such speech occurs only *because of* the plaintiff's employment, and the plaintiff would have had no occasion to engage in that speech absent her employment. Her interest in making that speech as a private citizen is, therefore, greatly diminished. Further, the government's restriction of such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422.

Second, a rule that offers constitutional protection to public employees when they speak pursuant to their job duties would risk creating "a constitutional cause of action [for] every statement . . . public employee[s] make[] in the course of doing [their] job." *Id.* at 426. Such a rule would sacrifice the government's important interest in the efficient and effective operation of its affairs, which the employee speech doctrine was crafted to preserve. It would give plaintiffs, like the one in *Anemone*, potential constitutional recourse, even where their supervisors act within the scope of their duties in taking remedial action against their employees' misconduct. Taken seriously, if the rule captured

18

official speech, it would be hard to imagine how government employers could supervise their employees at all without risking First Amendment litigation. *See Weintraub*, 593 F.3d at 201 ("The Supreme Court's employee-speech jurisprudence reflects the common sense realization[] that government offices could not function if every employment decision became a constitutional matter.") (internal quotation marks omitted). Such a rule would not only hamper the efficient operation of government but would also require the expenditure of significant resources on potentially endless First Amendment litigation. When an employee's speech is part of her job, the employee's supervisors have a responsibility to evaluate whether she is doing that job *well*.

Third, public employees who report official misconduct because it within the scope of their duties are not left without recourse if their employer retaliates against them. Those employees may not have a claim under the First Amendment, but they can "avail themselves of the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing." *Ruotolo v. City of New York*, 514 F.3d 184, 189 n.1 (2d Cir. 2008) (internal quotation marks omitted). The various whistle-blower and labor laws "as well as obligations arising from any

19

other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." *Garcetti*, 547 U.S. at 425–26. Long herself has taken advantage of one such protection, asserting a cause of action under New York's whistle-blower protection statute, New York State Civil Service Law § 75-b.

Finally, the government speech rule is not as broad as it may seem. It is not the case that all speech that is related to an employee's duties is exempt from First Amendment protection. Although speech pursuant to a public employee's work duties does not implicate the First Amendment, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. Rather, the "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

The Supreme Court in *Lane v. Franks* employed that reasoning when it determined that the plaintiff in that case had engaged in "speech as a citizen" when he testified in a trial on suspected misconduct by an elected official. *Id.* at

20

238–41.[2] Lane served as a director of a state youth program, which required him to oversee the program's day-to-day operations, fire and hire employees, and make decisions related to the program's finances. *Id.* at 231–32. He sued defendants after he was terminated for reporting that an elected official on the program's payroll had not been showing up to work and for testifying about his findings at that official's criminal trial after she was fired. *Id* at 232–34. The Court reasoned that although the plaintiff learned about the official's misconduct through his employment, his testimony about that misconduct was still citizen speech. *Id.* at 240–41. Lane's "ordinary job responsibilities," the Court explained, "did not include testifying in court proceedings." *Id.* at 238 n.4.

The Supreme Court also emphasized that it was of critical importance to protect the public employee's right to speak out on matters related to his employment. Such speech, the Court explained, especially when it involves issues related to public corruption, "holds special value precisely because those employees gain knowledge of matters of public concern through their

---

[2] Although the Court determined that the plaintiff's speech was entitled to First Amendment protection, it affirmed the lower court's grant of summary judgment in favor of one of the defendants on the First Amendment claim because that defendant was entitled to qualified immunity. *See Lane*, 573 U.S. at 246.

employment." *Id.* at 240. Indeed, the Court reasoned that "[i]t would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim." *Id.* at 240–41. The government speech test therefore preserves the right of a public employee to speak on matters related to her job, as long as that speech meets the other elements of the test.

With those principles in mind, we turn to the facts of the instant case.

B.     *Application*

The parties dispute whether, when Long cooperated with the Commission's investigation, she acted pursuant to her official job duties or as a private citizen. Long argues that her cooperation with the Commission "was not a part of her ordinary job duties," but was instead "highly unusual, indeed unique." Appellant's Br. 21. She points out that she was not employed by the Commission and had no responsibility to report to it. Long also argues that the Commission is an "independent body" and that any citizen, not just those who work for the town's judiciary, has the ability to report to or communicate with

22

the Commission. *Id.* at 22–23.

Defendants, on the other hand, argue that Long's complaint fails to adequately allege that she acted as a citizen when she cooperated with the Commission. They emphasize that all of Long's communications with and about the Commission occurred at work, during working hours, and that "but-for her position as a Town Justice Clerk," the Commission would never have sought information from Long. Appellee New Lebanon's Br. 9; *see also* Appellee Byrne's Br. 9–11.

We focus first on Long's refusal to answer Byrne's inquiries about the Commission's investigation. To determine whether it was within the scope of Long's work duties to discuss the Commission's investigation with Byrne, and therefore, whether she spoke as a citizen in refusing to do so, we pay close attention to Long's pleadings, which we must accept as true. *See Montero*, 890 F.3d at 394.

Long alleges that she was terminated because she refused to divulge the name of the complainant or otherwise discuss the Commission's investigation with Byrne. More specifically, she alleges that, months after she provided the files to the Commission, "Byrne came into the office angry, saying that she was

being investigated by the Commission." Appellant's App'x 24 at ¶ 17. Long

asserts that Byrne "related that she was angry [that Long] did not tell her who

filed the complaint against her." *Id.* Long then responded that she "had no idea

who made the complaint," and that, regardless, she had been "advised by the

representative of the Commission not to speak of it to anyone including . . .

Byrne." *Id.* Long also contends that it was not her responsibility "to advise a

Town Justice as to the requirements of the Commission on Judicial Conduct. The

requirements of the Commission on Judicial Conduct are within the purview of

. . . Byrne['s] service in her capacity as Town Justice." Appellant's App'x 27 at ¶

37.

The district court found those allegations insufficient to state a claim for

First Amendment retaliation. It emphasized that the attempted conversation

occurred during working hours and was between Long and her "supervising

judge." *Long*, 2024 WL 4710695, at *5. Contrary to the district court's conclusion,

those allegations are sufficient to survive defendants' motion to dismiss.

First, that Long's conduct involved, in significant part, a decision *not* to

speak does not strip her of First Amendment protection. The First Amendment's

guarantee of freedom of speech "necessarily compris[es] the decision of both

what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988) (emphasis in original). "The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted); *see also Jackler*, 658 F.3d at 241 (concluding that "it is clear that the First Amendment protects the rights of a citizen to refuse to retract a report to the police that he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct"). Long's refusal is, therefore, the sort of conduct that the First Amendment protects.

Second, the district court gave too much weight to the location of Long's speech and the person to whom she spoke. "Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made pursuant to the employee's official duties as an employee." *Ross*, 693 F.3d at 307. The critical inquiry is whether Long, in refusing to converse with Byrne about the Commission's investigation, was acting pursuant to her job duties; the location of the speech and the person to whom it was directed, while relevant, are not dispositive considerations.

The complaint adequately alleges that the speech in question was not a part of Long's duties. As alleged, Byrne initiated the confrontation with Long because she was angry that the Commission was investigating *her* suspected misconduct. The complaint does not allege that Byrne was angry because the Commission was investigating conduct that implicated Long's duties as Court Clerk, such as court employees' potential mishandling of court documents.

Long also alleges that Byrne was angry because Long would not tell her who filed the complaint with the Commission. But Long did not know the identity of the complainant. More importantly, Long alleges that it was not within the scope of her job duties "to advise a Town Justice as to the requirements of the Commission." Appellant's App'x 27 at ¶ 37. That allegation makes perfect sense in the context of the rest of Long's complaint. She asserts facts that support that the Commission is an independent entity; she is not employed by the Commission, and she is not required to report to the Commission. Accepting those allegations as true, as we must, there is no clear reason why it would be within Long's job duties to provide Byrne with information related to an independent third-party's investigation into Byrne's suspected misconduct. Even if it was within Long's job duties to tell Byrne who

26

had requested court files, it would not follow that it was also within Long's duties to give Byrne the information that she sought: the identity of the person who had filed complaints with the Commission. In any event, Long does not allege that Byrne inquired about the identity of the person who requested files or that Long refused to provide that information.

Long's assertion that she engaged in protected citizen speech by refusing to answer Byrne's inquiries about the Commission's investigation also coheres with the rationales that motivate the government speech doctrine. It is not clear in any way that Long's refusal to engage with Byrne on the Commission's investigation risked sacrificing the efficient operations of the Clerk's office. As we have explained, Long has adequately alleged that the Commission's investigation had nothing to do with her responsibilities. This case is, therefore, unlike *Anemone*. There, the plaintiff's speech reporting suspected misconduct to the Queens DA was clearly within the scope of his official duties. *Anemone*, 629 F.3d at 116–17. Moreover, had the defendant been unable to discipline the plaintiff for his continued communications with an outside investigatory agency, the MTA would not have been able to effectively and efficiently manage internal investigations. *Id.* But here, Long's adherence to the Commission's request that

she refuse to discuss its investigation with others did not risk hampering Byrne's effective supervision of Long's day-to-day responsibilities because that refusal was, as alleged, entirely independent of her job duties. Had Long discussed the investigation with Byrne, it may have furthered Byrne's private interest in identifying the identity of the complainant. But regardless of whether Byrne's private interest was legitimate (perhaps she wanted to prepare a defense by investigating the motives and knowledge of a false accuser) or illegitimate (perhaps she wanted to intimidate and corrupt a truthful accuser), nothing in the complaint suggests that it was part of Long's job duties to assist Byrne in furthering that interest.

There is also a clear civilian analogue to Long's conduct, which further supports that it was not related to her job responsibilities. *See Specht v. City of New York*, 15 F.4th 594, 603 (2d Cir. 2021). "Two examples of citizen analogues provided by the Court in *Garcetti* were a schoolteacher's letter to a local newspaper, which bore similarities to letters submitted by numerous citizens every day, and discussions of politics with a co-worker." *Id.* (internal quotation marks omitted). As we explained, Long's refusal to discuss the Commission's investigation with Byrne was unrelated to her job responsibilities. That

discussion, or lack thereof, was, therefore, similar to colleagues "discussing[, or refusing to discuss,] politics" in the office, which "is the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 547 U.S. at 423. In other words, Long and Byrne were just two people discussing matters beyond the scope of Long's employment.

Finally, Long alleges that she decided not to speak with Byrne about the Commission's investigation because the Commission "advised" her that it "would be unlawful to do so." Appellant's App'x 24 at ¶¶ 16–17; *id.* 27 at ¶ 34.[3] That allegation further supports that Long acted as a private citizen when she refused to discuss the Commission's investigation with Byrne.[4] Nothing in the

---

[3] Long does not cite any law for that proposition, and we have not found any supporting authority. Assuming, without deciding, that it would have been unlawful for Long to divulge her discussion with the Commission to Byrne, then another civilian analogue to Long's refusal may exist: "the right to reject governmental efforts to require [her] to make statements [that would violate the law]." *Jackler*, 658 F.3d at 241. But even if Long was not obligated to keep quiet about her knowledge of the Commission's investigation, her right to divulge or not to divulge that information to the subject of the investigation would be analogous to that of any other potential witness.

[4] We acknowledge that courts typically consider the speaker's motivation when assessing whether the speech was on a matter of public concern. *See Shara*, 46 F.4th at 84. The district court did not reach the public concern prong, and we accordingly do not address what Long's motivations may mean with respect to whether she spoke on a matter of public concern. Nevertheless, her alleged motivations are also relevant to whether she spoke pursuant to her job responsibilities.

complaint indicates that Long was motivated to comply with the Commission's request because she believed that her *job* required her to do so.

Instead, the complaint supports an inference that Long cooperated out of her sense of civic duty. Long alleges that when she cooperated with the Commission, she "was acting in the same manner as any private citizen to whom the Commission . . . inquired." Appellant's App'x 28 at ¶ 38. She further asserts that she had been "advised" by the Commission not speak with anyone about the investigation. *Id.* 24 at ¶ 17. Finally, she alleges that when she acted, she tried to "comply with the laws, rules, and regulations of the [Commission]." *Id.* 29–30 at ¶ 55. Regardless of whether the law actually required Long to cooperate with the Commission's investigation or to heed its request for confidentiality, those allegations support an inference that Long complied with the Commission's request because she believed that she would violate the law if she did not. Her desire to be a law-abiding citizen is not an employment-related motivation.

We therefore conclude that Long spoke as a citizen when she refused to discuss the Commission's investigation with Byrne. Our conclusion with respect to Long and Byrne's interaction would perhaps be different had Long refused to discuss a work-related topic with Byrne; discussing work-related topics in the

office with one's supervisor is within the ambit of one's job responsibilities. And indeed, after further development of the record, it may be the case that the conversation implicated Long's job responsibilities, including any job responsibilities that may relate to the Commission's investigation. But the record, which at this stage of the proceedings is limited to Long's complaint, does not indicate that to be the case.

After reviewing the same evidence, the district court reached the opposite conclusion, relying principally on *Ross v. Breslin*. *See Long*, 2024 WL 4710695, at *5. But *Ross* is distinguishable. As we explained, the plaintiff in that case was a former payroll clerk typist, who sued her government employer after she was fired for reporting suspected financial malfeasance in her office. *See Ross*, 693 F.3d at 302–04. We first determined, based on evidence uncovered during discovery, that Ross's job duties involved reporting financial malfeasance. In deposition testimony, Ross confirmed that "reporting pay irregularities to a supervisor was one of her job duties." *Id.* at 306. Each of her alleged speech acts involved reporting such irregularities, and so we concluded that they "were part and parcel of her official responsibilities." *Id.* As we have explained, however, Long's complaint supports the opposite conclusion. Unlike the plaintiff in *Ross* who

31

admitted that the speech in question was within the scope of her duties, Long expressly disclaims that her interaction with Bryne was pursuant to her duties as Court Clerk. Accordingly, *Ross* does not provide persuasive support for defendants' arguments.

We emphasize the limited nature of our ruling. We address only whether the district court correctly ruled that Long failed to plausibly state a claim based on its analysis of one portion of the test for whether the First Amendment protected her speech. Moreover, we express no view as to whether her complaint satisfies other aspects of the test that the district court did not reach. Further exploration of the facts regarding the precise nature of Long's duties and the details of her interaction with Byrne may lead to different conclusions about whether Long can sustain that claim. At this stage of the proceedings, limited to the allegations in the complaint, we hold only that the district court's conclusion that Long has not stated a plausible claim was legally erroneous, not that the complaint is necessarily meritorious.

We turn next to whether Long acted as a citizen when she provided, in response to the Commission's request, "case files on [four] individuals in connection with the complaint about defendant Byrne." Appellant's App'x 24

at ¶ 15. Here, again, we must pay close attention to Long's pleadings. There is, however, a dearth of information in Long's complaint about the nature of her job duties, making it difficult to discern whether her decision to provide the Commission with the files it requested falls within the scope of those duties.

Indeed, on that score, Long's complaint presents more questions than answers. What was the nature of the files that the Commission requested? Were the files that the Commission requested official court filings or the judge's confidential internal files? If the former, were the files open to the public or were they sealed? Was it Long's responsibility to provide public court files to individuals that requested them? If so, did she have the authority to exercise discretion to deny such requests, and what was the extent of that discretion? If it was Long's responsibility to provide the files, did the individual requesting them have to review the files in Long's office? Did Long permit the Commission's investigator to remove original files from the office? Or, did she allow the investigator only to review and copy the original filed documents? If the former, was that a violation of her job duties?

The complaint answers none of those questions, and they are all relevant to understanding the scope of Long's job duties. For example, if it was not within

the scope of Long's duties to provide case files to people who request them, then she might have been acting as a citizen when she provided the case files to the Commission. If, on the other hand, Long is required to provide files to those who request them, then her provision of the files to the Commission may not have constituted citizen speech. Moreover, the proper handling of the files would in any case be potentially a matter of legitimate concern for her supervisor.[5] Even if the files were public record and available to the public for inspection, allowing any member of the public, including a law enforcement officer, to remove the files from the office could constitute a serious breach of a clerk's responsibilities and result in significant negative consequences. Imagine, for example, that a court clerk allows a corrupt police officer to leave the office with files, which the officer later destroys or alters to cover up misconduct that the files evidence. That decision could result in the destruction of evidence that is critical to rooting out public corruption. Yet here, Long's complaint sheds no light on whether she let the Commission's representative leave her office with the documents, much less

---

[5] That could be a question properly assessed in connection with the second branch of the *Garcetti* test: even if providing files to inquirers was not part of Long's job responsibilities, the government as an employer has significant interests in regulating the conduct of employees in connection with documents to which they have access.

whether it would violate the rules of her office to do so.

Given both that the inquiry into an employee's job responsibilities is a "practical" one that requires analyzing various "contextual factors," *Shara*, 46 F.4th at 83, and that this case is at the motion to dismiss phase, further development of the factual record is necessary to fully understand the extent to which Long's provision of the case files intersected with her responsibilities as Court Clerk. *See Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. Nov. 28, 2012) (vacating and remanding the lower court's dismissal of the public employee's First Amendment retaliation claim because "whether a public employee is speaking pursuant to his official duties is not susceptible to a brightline rule" and "[h]ere, some discovery as to these matters is necessary before it can be decided whether [plaintiff] can or cannot pursue a First Amendment retaliation claim") (alterations adopted) (internal quotation marks omitted). Since the complaint adequately alleges that the First Amendment protects Long's refusal to answer Byrne's inquiries about the identity of the Commission's complainant, the district court erred in dismissing the complaint, and the case must be remanded for further proceedings. We therefore need not reach a conclusion about whether Long's allegations concerning her provision of

the files to the investigator could constitute protected First Amendment activity.

## III.    State-Law Claims

Long also alleges that defendants' conduct violated her rights under the New York State Civil Service Law § 75-b. After dismissing Long's First Amendment claim, the district court, in its discretion, declined to exercise supplemental jurisdiction over Long's claims under Section 75-b and dismissed that claim without prejudice. Because we vacate and remand the district court's judgment with respect to Long's First Amendment claim, the legal premise for the dismissal—the absence of a valid federal claim to support federal jurisdiction—is defeated. Accordingly, we also vacate the district court's judgment on Long's state-law claim.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, we VACATE the judgment of the district court, and REMAND the case for further proceedings.